HIDALGO COUNTY WATER CONTROL
AND IMPROVEMENT DIST. NO. 1
v. GOODWIN et al.
No. 1340—5460.

Commission of Appeals of Texas, Section A.
March 12, 1930.

Neal A. Brown and Geo. P. Brown, both of Edinburg, Don A. Bliss, of San Antonio, and Cofer & Cofer, of Austin, for plaintiff in error.

Jas. R. Dougherty, of Beeville, Vernon B. Hill, of Mission, for defendants in error.

SHARP, J.

This suit was instituted in the district court of Hidalgo county by Hidalgo County Water Control and Improvement District No. 1 against E. M. Goodwin and Hidalgo County Water Control and Improvement District No. 6 for the specific performance of a certain clause in a contract in writing made between plaintiff and E. M. Goodwin, which clause reads as follows:

"Should it be necessary that any additional permit to take water from the Rio Grande River be secured in order to supply the lands to be supplied under the terms of this contract with water for irrigation purposes, then the said Goodwin and his assigns bind themselves to secure such water permit and to convey same to Hidalgo County Water Control & Improvement District Number 1. It is further agreed, however, that in the event the said E. M. Goodwin should be unable to obtain a permit from the Board of Water Engineers to take water from the Rio Grande for the irrigation of said land, the Hidalgo County Water Control & Improvement District No. 1 hereby agrees to assign and transfer to the said E. M. Goodwin, or his assigns, a sufficient amount of water of the Rio Grande River, which is already owned by the said Hidalgo County Water Control & Improvement District No. 1."

Plaintiff further alleged that Goodwin, prior to June 26, 1926, had procured an option to purchase about 5,600 acres of land in porciones 48, 49, 50, 51, and 52 in Hidalgo county or at least in some one or more of the porciones; that plaintiff owned a water appropriation under the laws of Texas for the irrigation of lands in the porciones above described, and had constructed its main line of canal on and over the lands and had finished a pumping plant on the Rio Grande river at or near the village of Penitas, and that the pumping plant and canal had an ample capacity to supply water for irrigation purposes to not only the lands in plaintiff's district, but also to all lands in the porciones above described, and at the time plaintiff was actually operating the pumping plant and main canal, and that it had already sold and conveyed permanent water rights appurtenant to the lands in the porciones above described, unto owners thereof, aggregating 2,-031.94 acres, for which the owners had agreed to pay the sum of $15 per acre for the permanent water rights in addition to the conveyance of the right of way through their lands for the main canal.

That E. M. Goodwin, knowing these facts, approached the plaintiff for the purpose of obtaining an option to purchase a permanent water right to irrigate the 5,600 acres of land, of which he had obtained an option, and, if possible, to organize a water and control district, embracing about 25,000 acres of land in the porciones above described, including the 5,600 acres of land upon which he had an option to purchase, and further desired to procure from plaintiff an option to purchase a permanent water right, and also a contract as to prices at which an actual water supply would be furnished by plaintiff out of its main canal for the lands.

It is further alleged that Goodwin informed plaintiff that he had asked the state board of water engineers for a new appropriation of water covering the lands in the porciones described above and that plaintiff's attorney, after the conference, agreed to assist in getting the permit from the state board of engineers, and plaintiff would waive its rights, and that the permit so obtained from the board of water engineers would be transferred by Goodwin to plaintiff; that by reason of said agreement, Goodwin obtained the water permit from the board of water engineers, and, instead of transferring it as he had agreed to plaintiff, he transferred it to the Hidalgo County Water Control and Improvement District No. 6; that the Hidalgo County Water Control and Improvement District No. 6 had actual notice of the contract Goodwin had with plaintiff to convey to plaintiff the water permit when obtained.

Among other things, plaintiff prayed for damages, etc. Defendants filed general demurrer, special exceptions, general denial, etc. The pleadings are voluminous and all of the allegations made by plaintiff and the matters contained in the answers made by defendant will not be detailed herein, but will be set out as is necessary for a decision of this case.

The contract entered into by and between plaintiff and E. M. Goodwin, and out of which this controversy arose, is as follows: "State of Texas, County of Hidalgo.

"The contract this day made and entered into between the Hidalgo County Water Con-

trol & Improvement District No. 1 and E. M. Goodwin, is as follows:

. "(a) It is contemplated by the said E. M. Goodwin that a water improvement district, or a water control and improvement district, shall be organized under the laws of Texas to embrace lands in Porciones 48, 49, 50, 51 and 52, in Hidalgo County, Texas, and after the incorporation of such a district, said district as so incorporated shall have the right at its option to contract with the said Hidalgo County Water Control and Improvement District No. 1, as hereinafter set forth, and that in the event no such district should be organized under the laws of the State of Texas, then the said E. M. Goodwin at his option shall have the right to contract with the said Hidalgo County Water Control and Improvement District No. 1 upon the terms and under the conditions as hereinafter set forth.

"(b) The contract herein provided to be made between the said Hidalgo County Control & Improvement District No. 1, Party of the First part, and the said E. M. Goodwin, Party of the Second part, is as follows:

"1. The said Hidalgo County Water Control & Improvement District No. 1 agrees with the said E. M. Goodwin that it will furnish unto the said E. M. Goodwin, or his assigns, a supply of water sufficient to properly irrigate a minimum of 5,600 acres of land in said Porciones, and a maximum amount sufficient to irrigate 25,000 acres in said Porciones, for which the said E. M. Goodwin, or his assigns, is to pay the Hidalgo County Water Control & Improvement District No. 1 at the rate of $17.50 per acre as the price of a water right to be extended by the said Hidalgo County Water Control & Improvement District No. 1 to the lands embraced within the Water Improvement District or Water Control and Improvement District, to be organized, or included in the irrigation system installed by the said E. M. Goodwin, and being lands out of said Porciones 48, 49, 50, 51, and 52, the payment of said $17.50 per acre to be made as follows:

"On or before nine (9) months from the ———— day of ————, 1926; it being understood, however, that it is contemplated by the E. M. Goodwin to perfect the organization of said Water Improvement or Water Control and Improvement District, and that bonds will be voted and marketed for the purpose of constructing the pumping plants and canals, and of paying for the water right hereby contracted to be conveyed, it is further agreed that in the event the said E. M. Goodwin should be unavoidably delayed in the organization of said District and the marketing of the bonds of said District, as above provided for, upon satisfactory proof to the Board of Directors of the Hidalgo County Water Control & Improvement District No.

1 that fair and reasonable progress is being made in the perfection of said District and the marketing of said bonds, a reasonable extension of time for the payment of said $17.50 per acre to the Hidalgo County Water Control & Improvement District No. 1, shall be granted to the said E. M. Goodwin for the purpose of perfecting the organization of said District and the marketing of said bonds by said District.

"2. In addition to said charge for said water right, the said E. M. Goodwin agrees to pay to the said District at the rate of $2.50 per acre foot for each actual delivery of water, based on the price of fuel oil at $1.-75 per barrel and for each 10 cents in excess in the price of said fuel oil per barrel said District shall have the right to increase said charge at the rate of 12 cents per acre foot, during such time as the price of said fuel oil shall be in excess of $1.75 per barrel; the minimum price to be $2.50 per acre foot, unless and in the event said District shall reduce the price of the water charge to the land owners within its District to a less sum than $2.50 per acre, then and in that event the rate herein provided for to be charged to the said E. M. Goodwin, or his assigns, shall be reduced proportionately to the reduction made to the land owners within said Hidalgo County Water Control & Improvement District No. 1.

"3. The said E. M. Goodwin agrees to pay for 250 acres feet of water for the first year after the said district to be organized by him, or the irrigation system to be established by him, is ready to receive water for the irrigation of said lands included therein, whether such water should be used or not, and that such fixed charge shall increase each year at the rate of 250 acre feet until the minimum yearly charge shall be for the same number of acre feet as the number of irrigable acres of land in the district to be organized or under the system to be established by the said E. M. Goodwin.

"4. Said charge for water shall be paid in advance by the said E. M. Goodwin, or his assigns to the said Hidalgo County Water Control & Improvement District No. 1, on the first day of November of each year to be credited upon the amount of water that said Goodwin actually takes from the canal of the Hidalgo County Water Control & Improvement District No. 1, during such year, provided, however, that all water in excess of said 250 acre feet shall be paid for in advance upon application of demand for the furnishing of said water for the irrigation of said additional land.

"5. Should the said E. M. Goodwin fail to pay unto the said District the said amount as hereinabove provided for then the said District shall have the right to shut off any water supply whatsoever until said charge is

fully paid unto it with interest at the rate of ten per centum per annum from the date when such charge shall have accrued; and in case the said Goodwin should desire a greater supply of water over and above the minimum he pays for, then he shall pay cash to said District for any and all water that may be delivered to him under the terms of this contract, at the rate herein specified.

"6. A supply of water sufficient to irrigate all said lands as they become ready for irrigation shall be delivered by the said District in its canal, and the said Goodwin hereby agrees and binds himself to construct, maintain and operate at his own expense a pumping plant on said canal for the purpose of pumping water from the canal of said district, and the said Goodwin further binds himself and his assigns to install a meter at said pumping plant at his own expense, for the purpose of measuring the amount of water, the plans for the installation of said pumping plant and of said meter to be submitted to the Engineer of the District beforehand and to be approved by the said Engineer of the District. Said pumping plant and meter shall at all times be subject to inspection by the Engineer of said District, and said meter shall at all times be under the joint control of the Engineer of said District and the Engineer of the said E. M. Goodwin or his assigns, and any deficiencies therein shall be corrected and supplied by the said E. M. Goodwin, or his assigns.

"7. Should any lands be included in the District that is to be organized, which lands the said Hidalgo County Water Control & Improvement District No. 1 has agreed to supply with water under a contract, or contracts heretofore made, then the said lands shall be entitled to receive a supply of water under the terms of this contract at the price and under the terms hereinbefore set forth, regardless of what may have been the original contract or contracts between this District and the said person or persons owning said lands; provided, however, that if the said Hidalgo County Water Control & Improvement District No. 1 shall have heretofore contracted with any owner of land or lands that may be embraced within the limits of the District that the said Goodwin expects to be organized for a premium or price of a water right less than $17.50 per acre, as stipulated herein, the said Goodwin shall have the advantage of said price for said water rights; but, in no event shall he be entitled to receive the water actually supplied for a less rate per acre foot than herein specified.

"8. The privileges and rights herein extended unto the said E. M. Goodwin by the terms of this contract shall be assignable by him to the said District that he expects to be organized and, when so assigned by him, shall in all respects be binding as between the said Hidalgo County Water Control & Improvement District No. 1, and such District that may be organized. In the event such a District should be organized and the said E. M. Goodwin should assign unto it all of his rights and privileges under the terms thereof, then the total amount of the price hereinbefore agreed upon for the water right, that is, the right to take water from the said canal of the said Hidalgo County Water Control & Improvement District No. 1 shall be paid in cash according to the terms of this contract by such District so organized.

"9. Should it be necessary that any additional permit to take water from the Rio Grande River be secured in order to supply the lands to be supplied under the terms of this contract with water for irrigation purposes, then the said Goodwin and his assigns bind themselves to secure such water permit and to convey same to Hidalgo County Water Control & Improvement District Number 1. It is further agreed, however, that in the event the said E. M. Goodwin should be unable to obtain a permit from the Board of Water Engineers to take water from the Rio Grande for the irrigation of said land, the Hidalgo County Water Control & Improvement District No. 1 hereby agrees to assign and transfer to the said E. M. Goodwin, or his assigns, a sufficient amount of water of the Rio Grande River, which is already owned by the said Hidalgo County Water Control & Improvement District No. 1.

"10. Should there at any time be a shortage of the supply of water within the Rio Grande River, then it is distinctly understood that the lands within the territorial limits of the said Hidalgo County Water Control & Improvement District No. 1 shall first be supplied with water before any water shall be supplied under the terms of this contract unto the lands hereinbefore mentioned in which event the said Hidalgo County Water Control & Improvement District No. 1 shall not be liable in damages for a failure to supply a sufficient amount of water to irrigate any lands under the terms of this contract.

"11. The said Goodwin or his assigns under the terms of this contract shall report to the Board of Directors of said Hidalgo County Water Control & Improvement District Number 1, the acreage to be irrigated and the character of the crops for the succeeding year on the first day of November of each year.

"The said Goodwin has this day paid unto the Hidalgo County Water Control & Improvement District Number 1, the sum of Twenty-five ($25.00) Dollars in cash, and the said Hidalgo County Water Control & Improvement District Number 1, hereby acknowledges the receipt of said sum of money as the consideration for this option contract.

"It is understood and agreed that this contract shall be binding upon the Hidalgo

County Water Control & Improvement District No. 1 and upon its successors and assigns.

"This Contract to be signed in Duplicate and each of the parties to retain a copy hereof.

"In Testimony Whereof the Hidalgo County Water Control & Improvement District No. 1 has caused these presents to be signed by its President and countersigned by its Secretary, and the corporate seal hereunto affixed, and in testimony whereof witness the hand of the said E. M. Goodwin on this, the 26th day of June, A. D. 1926.

"Hidalgo Co. Water Control & Im. Dist. No. 1,
"By Emile Monney, President.
"Party of the First Part.
"E. M. Goodwin,
"Party of the Second Part.

"Attest:
"J. W. Hardin, Secretary."

A trial was had before the court without a jury. The court filed findings of fact and conclusions of law and judgment was rendered to the effect that plaintiff take nothing by its suit. The case was appealed to the Court of Civil Appeals for the Fourth Supreme Judicial District at San Antonio, and by a majority opinion of the court affirmed. 14 S.W.(2d) 321. A writ of error was granted by the Supreme Court.

The record discloses that plaintiff claimed to be the owner of seven water appropriations. The first was made by John Closner and W. S. Dougherty in December, 1907; the second was made by John Closner on July 22, 1908; the third was made by John Closner, acting as president of the Rio Grande Valley Reservoir & Irrigation Company on September 4, 1908; the fourth was made by John Closner as president of the Rio Grande Valley Reservoir & Irrigation Company on June 4, 1909; the fifth was made by D. B. Chapin for himself and his associates, J. R. Alamia and V. A. Albers, on December 22, 1909; the sixth was made by John Conway on January 4, 1909; and the seventh was made by W. F. Sprague on June 26, 1914, acting as president of the Valley Reservoir & Canal Company.

It is shown that the appropriations above described provided for a system of canals running through porciones 48, 49, 50, 51 and 52, and also a reservoir through which water was to be conducted by pumping on to the lands to be irrigated. Plaintiff claims by conveyance all of the water rights contained in the seven appropriations above described, by reason of the deed dated February 9, 1925, from R. B. Creager, receiver, but the contents thereof will not be set out herein.

It will be observed that the first six of the water appropriations above described were made under the law enacted by the Legislature in 1895 (Acts 24 Leg. c. 21), and that the one made to W. F. Sprague on June 26, 1914, was made under the general laws approved in 1913.

The Act of 1895 says:

Sec. 6. "Every person, corporation, or association of persons who have constructed or may hereafter construct any ditch, canal, reservoir, dam or lake for the purposes named in this act, and taking the water from any natural stream, storage reservoir, dam or lake, shall within ninety days after this act goes into effect, or within ninety days after commencement of such construction, file and cause to be recorded in the office of the county clerk of the county where the headgate of such ditch or canal may be situated or to which said county may be attached for judicial purposes, in a well-bound book to be kept by said clerk for that purpose, a sworn statement in writing showing approximately the number of acres of land that will be irrigated, the name of such ditch or canal, the point at which the headgate thereof is situated, the size of the ditch or canal, in width and depth, and the carrying capacity thereof in cubic feet per second of time, the name of said stream from which said water is taken, the time when the work was commenced, the name of the owner or owners thereof, together with a map showing the route of such ditch or canal; and when the water is to be taken from a reservoir, dam or lake, the statement above provided for shall show in addition to the ditch and other things provided for, the locality of the proposed dam, reservoir or lake, giving the names or numbers of the surveys upon which it is to be located, its holding capacity in cubic feet of water, the acreage and surface feet of land that will be covered and the limits of such lake, reservoir or dam, and the area of the watershed from which the storm or rain water will be collected.

"Sec. 7. By compliance with the preceding provision of this act the claimant's right to the use of the water relates back to the time when the work of excavation or construction was commenced on said ditch, canal, reservoir, dam or lake: Provided, that a failure to file said statement shall in no wise work a forfeiture of such heretofore acquired rights, nor prevent such claimants of such heretofore acquired rights from establishing such rights in the courts."

Section 38 of the Act of 1913 (Acts 33rd Leg. c. 171), reads as follows:

"Within ninety days after the date of issuance of the permit provided for in this Act, the applicant seeking to appropriate water thereunder shall begin actual construction of the proposed ditch, canal, dam, lake, reservoir or other work, and shall prosecute the work thereon diligently and continuously to

completion; provided, that the board may by an order entered of record, extend the time for beginning the actual construction of such work for a period not to exceed twelve months from the date of issuance of such permit; and further provided, that if any applicant shall fail to comply with the requirements of this section, he, they, or it shall thereby forfeit all rights under such permit. If any applicant to whom a permit is issued shall, after beginning the actual construction of work as provided in this section, fail to thereafter prosecute the same diligently and continuously to completion, the board may, after notice to the applicant, and giving him an opportunity to be heard, by an order entered of record, revoke and cancel such permit, in whole or in part. A certified copy of such order shall be forthwith transmitted by the secretary of the board, by registered mail, to the clerk of the county in which such permit is recorded, and which order shall be recorded by said county clerk; provided, that any applicant whose permit is thus cancelled or revoked or sought to be cancelled by the board shall have the right to contest same in the district court in the same manner as provided in this Act for the rejection of an application."

By proper assignment plaintiff complains of the actions of the trial court in permitting John Closner, while on the witness stand testifying in behalf of defendants, to testify as follows: Closner testified that he and W. D. Dougherty had on December 27, 1907, made a declaration of intention to appropriate water, which declaration was introduced in evidence and that the declaration provided for "a system of canals leading from said Rio Grande to said reservoir" and "that the head gate of the principal canal will be situated on the Northern bank of said Rio Grande in Hidalgo County, Texas, at a point on said river about one mile down said river from the town of Penitas," etc. and for a system of canals extending "to a point from the East line of said Los Ejidos Tract, 350 varas more or less north of the Military Telegraph Road; thence East through porciones 48, 49, 50, 51, 52, 53, 54, 55, 56, and 57, so as to intersect with and empty into said artificial reservoir" etc., and several declarations of intention to appropriate water had also been introduced in evidence by plaintiff, bearing subsequent dates, continuing the appropriation made by said first-named instrument clear on down to the year 1914. These subsequent appropriations described additional lands. The first appropriation mentioned was to irrigate 150,000 acres of land and the subsequent appropriations increased the quantity of land up to 250,000 acres. John Closner had testified that he was connected with each and all of said appropriations and had an interest therein, whether they were made by him in person or by other persons. And it appears,

from plaintiff's bill of exceptions, that all of said appropriations down to and including the one made in 1914 had by regular chain of title vested in the plaintiff. While John Closner was on the stand testifying in behalf of defendants, the following question was propounded to him: "I will ask you Mr. Closner, if under this appropriation that you made here in 1907, (the one made by both him and W. D. Dougherty) it was your intention to irrigate the lands between the Penitas pumping site that is designated there and the river?" Plaintiff's counsel objected and stated that the instruments themselves were the best evidence and that the instruments spoke for themselves. This objection was overruled by the court, and the defendant answered: "No, sir." The witness Closner was further asked this question: "What lands did you have in mind to irrigate under this appropriation?" And the witness was permitted to answer over the objection of the plaintiff as follows: "From along about 58 (porcion) on down." The witness Closner testified that W. D. Dougherty was dead and was asked by counsel for defendants this question: "Did you know Mr. Dougherty's intention too, he is dead you say, with regard to whether he intended to irrigate these lands West of Mission out here from porcion 52?" Plaintiff made same objection and further objected to this testimony that witness could not know what Dougherty's intention was. The court ruled that if the witness knew what their intention was, he could testify to it, and thereupon the witness was permitted to answer as follows: "I know what he done, that's all I can say. He, (Dougherty) watered between the Military Road and the river." Counsel for the defendants asked the witness Closner the following question: "Not what he watered, what I am talking about, you have stated to the court that it was not your intention by this appropriation to irrigate any of the lands between the Penitas and the so-called reservoir?" and the witness answered "no, sir." The witness was further asked the following question: "Now do you know whether it was Mr. Dougherty's intention?" and the witness answered "No, he didn't." The defendants' counsel then asked the following question: "Do you know whether it was Mr. Dougherty's intention to water these lands between Penitas and the river with this canal?" And the witness answered "No, sir, it wasn't his intention." Counsel for defendants asked the witness Closner the following question: "On this map here right at porcion 60 at the North bank of this reservoir, there is a canal outlined there what runs out beyond the Retama. What lands did you expect to water out that way?" And the witness was permitted to answer "We watered some of Hoit and Hammond's land and then the Edinburg proposition and the Retama and this stuff out here." Counsel for plaintiff

objected to all of the foregoing testimony and saved objection by proper bill of exception.

The record shows that John Closner was not a party to this suit and that plaintiff claimed by transfer or conveyance all of the rights in the water appropriations above described. The importance of this testimony against plaintiff is further emphasized by the findings of fact and conclusions of law made by the trial court, which are set out as follows:

."16. I find that the representations made by plaintiff district to defendant E. M. Goodwin and upon which defendant Goodwin relied when he purchased lands in Porciones 48, 49, 50, 51 and 52, and upon which he relied when he executed the contract of June 26, 1926, and upon which he relied when he negotiated with plaintiff district in February 1926, viz: That if plaintiff district owned the water right and appropriation on all the lands in Porciones 48, 49, 50, 51 and 52 (which lands are now included within the boundaries of defendant, Hidalgo County Water Control and Improvement District No. 6) were untrue, and that as a matter of fact, plaintiff district and its predecessors had no title to any water right or appropriation covering lands in Porciones 48, 49, 50, 51 and 52, and neither plaintiff nor its predecessors ever had any title thereto, and that the lack of ownership in plaintiff of such water right was apparent in plaintiff's title papers at the time it represented to defendant Goodwin that it owned the water rights. I further find that if I am mistaken in holding that neither plaintiff nor any of its predecessors in title ever had a water right or appropriation covering said lands in Porciones 48, 49, 51 and 52, then I find that such appropriations and water rights had been lost, long before February 1926, by non-user and abandonment."

Conclusions of Law.

"Based upon the foregoing findings of fact, I conclude as a matter of law plaintiff.is not entitled to recover."

It is contended by the defendants that if plaintiff ever had any water right, with reference to the lands in porciones 48, 49, 50, 51, and 52, that they have been forfeited and if they are mistaken in that contention, that the plaintiff has lost whatever water rights they may have ever had by reason of non-use and abandonment. It is undisputed that no one representing the state has undertaken to forfeit or cancel the water rights held by plaintiff under the Laws of 1895, 1913, or under any other acts pertaining to irrigation. Forfeitures generally are not favored by law, and the laws relating to irrigation are liberally construed and given such effect as to best promote irrigation and thereby carry out the purpose of the Legislature. Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 138 S. W. 575, Ann. Cas. 1914B, 322.

Counsel for defendants earnestly contend that because counsel for plaintiff cross-examined the witness, John Closner, upon the matters complained of, that the objections were waived. This contention is not sound or tenable. Cathey v. M., K. & T. Ry. Co. of Texas, 104 Tex. 39, 133 S. W. 417, 33 L. R. A. (N. S.) 103.

In our opinion, the court erred in permitting the witness, John Closner, to testify to the matters above complained of and that the evidence admitted was inadmissible and prejudicial to the rights of plaintiff. Lott v. Kaiser, 61 Tex. 665; Bruner v. Strong, 61 Tex. 557; Belcher v. Mulhall, 57 Tex. 19; Ord v. Waller (Tex. Civ. App.) 107 S. W. 1166.

The honorable Court of Civil Appeals held in its opinion that the contract above set out was an optional contract. The contract is, in some respects, an optional contract, in that it does not primarily bind Goodwin to do anything, but gives him the option of proceeding under the contract. By the provisions of section 9 of the contract, it is provided that in case it is necessary to secure an additional permit to take water from the Rio Grande river, then Goodwin and his assigns bind themselves to secure such water permit and convey same to Hidalgo County Water Control and Improvement District No. 1. This provision of the contract is not optional with reference to the obligations on the part of Goodwin to convey the additional water permit to the district. It is an unconditional agreement on his part. Under section 9 he agreed to convey to the district any water rights he might secure. There was a valuable consideration for this agreement, in that the district bound itself to do and perform certain things for the benefit of Goodwin. The mere fact that the parties elected to name the contract an optional contract does not mean that he had a right to secure water rights that destroyed the rights of the district, and thus have the right to convey or refuse to convey such rights at his option. In other words, the contract is optional in that Goodwin did not have to proceed thereunder, but if·he chooses to do so, he must accept the contract as a whole. He did proceed under the contract when he took out additional water rights. We are of the opinion that upon its face section 9 of the contract is not an optional contract.

In the case of Corsicana Petroleum Co. v. Owens et al., 110 Tex. 568, 222 S. W. 154, 155, the Supreme Court of Texas, by Chief Justice Phillips, says:

"An option is granted for the purpose of enabling the grantee to exercise the particular right or not, as he may elect. The value of it consists in that privilege. Owners of property have the unquestioned power to grant such rights with respect to it. They

are free to validly make such contracts. When so made, it is the duty of courts to uphold and enforce them."

In view of the fact that this case will be reversed and remanded, we will not discuss nor consider the other matters complained of, because they will not likely arise upon another trial.

For the reasons herein stated, we recommend that the judgment of the Court of Civil Appeals and the trial court be reversed, and that this case be remanded to the trial court for another trial.

CURETON, C. J.

The judgments of the district court and Court of Civil Appeals are both reversed, and cause remanded to the district court, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.