## GREAT AMERICAN INDEMNITY CO. v. DABNEY.

### No. 5016.

Court of Civil Appeals of Texas. Amarillo.
April 17, 1939.

Rehearing Denied May 22, 1939.

R. T. Bailey, of Dallas, for appellant.

James K. Byers, of Dallas, for appellee.

JACKSON, Chief Justice.

This appeal is prosecuted by the Great American Indemnity Company from a judgment obtained against it in the District Court of Dallas County by Phoebe Dabney in a suit to recover compensation for the death of her husband, Richard Dabney, who, she alleges, lost his life while in the employ of the American Ice Company.

No complaint is made of the, sufficiency of the pleadings of either party and no question as to the jurisdictional facts is presented, hence, an extended statement of the pleadings is not required.

The appellee alleged that her husband over-exerted himself while performing his duties, causing the rupture of a blood vessel in his brain, resulting in death. She admitted that her claim was not filed with the Industrial Accident Board within six months after the death of her husband but asserted that good cause existed for such failure, pleading that his employer knew of the injuries and death but failed to file notice thereof with the Industrial Accident Board; that a few days after Dabney's

death she was advised by Howard Campbell, an employee of the American Ice Company, that no insurance was carried by it that would protect her for the death of her husband; that soon after he was buried she employed Frank C. O'Brien, an attorney of Dallas, to investigate the matter, ascertain if she could collect anything because of her husband's employment and death, and was thereafter advised by him that she was entitled to recover compensation insurance for his death; that he would represent her, file her claim, but failed to do so; that she relied on this advice and did not know until January 13, 1936, that the American Ice Company carried compensation insurance to protect its employees; that she believed that the employer advised her attorney that it did not carry compensation insurance for which reason he failed to file her claim, but if mistaken in that then her attorney failed to file the claim, either by accident or mistake or was acting in bad faith for the purpose of defrauding her, having first advised her she was entitled to recover and her claim had been filed, and later advising her she could not recover.

The appellant answered by general demurrer, general denial, alleged that the deceased did not sustain any injury in the course of his employment that either caused or contributed to cause his death, but that he died as a result of natural causes.

In response to special issues submitted by the court, the jury found in effect that the deceased sustained an injury in the course of his employment on September 8, 1933, with the American Ice Company; that the injuries resulted in brain hemorrhage from which he died; that death was the result of the combined effect of the injury received on September 8, 1933, and a pre-existing disease; that the agent of the American Ice Company stated to her subsequent to the death of her husband that the Company carried no insurance that would protect her for his death; that at all times prior to January 14, 1936, she believed and relied upon such statement; that in so believing she used such diligence as a person of ordinary prudence would have exercised under similar circumstances; that Mr. O'Brien, the lawyer who first represented her, advised her in substance that she could recover; that claim had been filed; and later informed her she could not recover; that she used due diligence in relying on these statements until January 14, 1936; that the employer

of deceased should have made a report to the Industrial Accident Board but did not; that she did not actually discover or know until January 14, 1936, that the American Ice Company carried compensation insurance for the protection of its employees; that she used reasonable diligence in filing her claim subsequent to the time she employed the attorney now representing her; that the death of deceased was not solely caused by heart trouble, kidney trouble or hardening of the arteries.

There were numerous other special issues submitted all of which were answered in favor of the appellee but, in our opinion, a disposition of this appeal does not require us to give the substance thereof.

On the finding of the jury judgment was entered that appellee recover from appellant the sum of $2,942.01, from which judgment this appeal is prosecuted.

The appellant presents as error the action of the court in permitting appellee to offer in evidence over its objections the purported record of the Parkland Hospital as such records were but ex parte statements of persons whom it was claimed made them. It is conceded that Richard Dabney, the deceased, was admitted to the Parkland Hospital in Dallas at 3:30 A. M. on September 8, 1933. Miss Nora Smith, a witness called by appellee, stated that she became record librarian for the hospital in October 1936, and her duties were to see that the records are complete, properly filed, cross-filed and placed away for permanent keeping; that she had supervision over such records under the direction of the superintendent of the institution; that the records were kept according to the general outlines of standardization of the American Medical Association and the American College of Surgeons; that she had with her the hospital records of the admittance thereto of deceased. After these preliminary statements she was permitted to testify that the record was made by the nurses, doctors and attendants of the hospital in the line of their duties, to which statement appellant objected because hearsay. She then exhibited Exhibit No. 10, which purported to constitute the entire record of the hospital pertaining to Richard Dabney.

The appellant objected to the introduction of Exhibit No. 10, which was composed of the admission record, admittance notes, personal history, physical examination, progress record, treatment, graphic

chart, bedside notes, permission for post-mortem operation and autopsy report because hearsay as to appellant, not properly identified, not made by or under the supervision of this witness, and specially objected to the admittance notes, which recite that the deceased "fell out suddenly," because it does not appear from whom such information was obtained, nor that the party signing it had personal knowledge of the facts enumerated therein, nor that it was made by the patient or anyone who knew of it, nor that such information was correct; that it was a self-serving declaration. Particular objection was urged to the autopsy report because it was an unsigned carbon copy, the original was not accounted for, and not the best evidence.

Evidently Exhibit No. 10 did not consist of a book in which original entries had been made or into which the original entries had been transferred, but a file of several sheets of paper upon each of which had been written different matters for the information of the hospital and afterwards arranged in an orderly and convenient manner for reference. The admission of some of the information contained on these sheets was harmless because shown by other testimony, however, there is no testimony in the record to the effect that the deceased "fell out suddenly"; the evidence is that he announced to one of his co-workers, whom he asked to take over his machine, that he was sick and went and lay down. The record of the physical examination discloses the working diagnosis after physical examination—sub-dural hemorrhage. The progress record discloses that the patient was having convulsions; that he expired, and that the "autopsy showed sub-dural hemorrhage. Final diagnosis, subdural hemorrhage." The witness then read the graphic record, the bedside notes, the permit from the appellee for the post-mortem operation on her husband, and subsequently read the report of the autopsy findings which contained in condensed form much of the matter in the record previously introduced, but in addition showed that the autopsy was had September 8, 1933 at 9:00 A. M.; that the deceased "fell out suddenly"; and many other matters unnecessary to give, but contains the following: "Brain: The cranial cavity is filled with blood on opening the dura. The blood is partially clotted and is most extensive over the base of the brain, covering over the meninges and concealing the larger arteries at the base of the brain.

There is extensive blood clot over the cerebral lobes also covering and almost concealing from view the pia mater. On section there is no hemorrhage into the substance of the brain and the ventricles are normal in size. The spinal cord is covered with hemorrhage also. Heart: is about twice the normal size weighing 610 grams. The myocardium at the apex of the left ventricle is 2 cm. in thickness." Then follows the condition of the aorta, lungs, liver, gall bladder, kidneys, spleen, pancreas, and other organs, in detail, and proceeds: "Anatomical diagnosis: Massive cerebral hemorrhage, sub-dural. Hypertrophy of the heart. Atheroma of the aorta. Edema of the lungs. Hypostatic congestion of kidneys and liver. Retention cysts of kidneys. Adenoma of kidney. Chronic Splenitis. Cause of Death: Massive subdural hemorrhage." This witness testified that the autopsy report was a carbon copy, was unsigned and did not bear the seal of the hospital. Dr. Ward testified in substance that if the deceased had a rupture of the blood vessel of the brain "as shown by the autopsy report" that the work he was doing for the Ice Company could have been a producing cause of his death. Dr. Shannon testified that in his opinion "according to the autopsy finding", the death of deceased was unquestionably the result of a massive hemorrhage of the brain, but would not necessarily be a major factor in bringing about the hemorrhage.

No effort was made to account for the original of the carbon copy of the autopsy report. The witness, Miss Smith, could not have known except from hearsay that the records were made by the nurses, doctors and attendants of the hospital, since she entered the service of the hospital in October 1936 and the record of the hospital pertaining to Richard Dabney was made September 8, 1933, and for the same reason none of the record introduced was made by her or under her supervision. It is not shown affirmatively that the records were correct; that the parties making the records were not available as witnesses, and there is no proof that such parties were in the habit of keeping correct records, nor that the Parkland Hospital was a State institution.

In 22 C.J. 902, para. 1100, the author says: "In the absence of statute, hospital records are as a rule, although not invariably, held not admissible as evidence of the facts stated therein. Such records are

sometimes made evidence by statute." A number of authorities are cited to support this proposition.

In Griebel v. Brooklyn Heights R. Co., 95 App.Div. 214, 88 N.Y.S. 767, 768, the Appellate Division of the Supreme Court of New York, affirmed in Mem. opinion 184 N.Y. 528, 76 N.E. 1096, said: "We agree with the learned counsel for the appellant that the so-called 'bedside notes' were not admissible in evidence. They were introduced during the examination of a hospital nurse, who was in the Brooklyn Homeopathic Hospital at the time when the plaintiff was a patient there. She described the paper as a 'temperature chart, known in the hospital as bedside notes,' and said that such notes were taken in each case where a patient was brought to the hospital. We are not aware of any rule of evidence which makes such a paper, offered under such circumstances, admissible. Its contents related chiefly to the physical condition of the patient, specifying particularly the injuries from which he was suffering."

In Osborne v. Grand Trunk Railway Company, 87 Vt. 104, 88 A. 512, 515, Ann. Cas.1916C, 74, the Vermont Supreme Court says: "Immediately after his injury the plaintiff was taken to the Sherbrooke Protestant Hospital at Sherbrooke, in the Providence of Quebec, where he remained more than a month, being treated by Dr. George L. Hume, assisted by another physician. Under a system which obtains in that institution, the senior nurse in charge of the plaintiff was required to keep and did keep a hospital record of the case. One of the plaintiff's day nurses a part of the time, under Dr. Hume, was present at the trial, and testified in keeping such a record as to the plaintiff, in which most of the symptoms noticed, and all medicine administrated, by her were entered. It appears that other nurses, especially night nurses, made entries on this record, and no evidence was introduced as to the accuracy of the entries made by any of them. The exceptions show nothing concerning the names or the whereabouts of such 'other nurses,' nor why they were not present as witnesses at the trial." Under note "Chart Held Inadmissible", Ann.Cas. 1916C, on page 79, following the above case, many authorities are cited holding that hospital records are not admissible.

See also Covert v. Calvert et al., Tex. Civ.App., 287 S.W. 117; Porter et al. v. Rogers, Tex.Civ.App., 293 S.W. 577; Mass-achusetts Bonding & Ins. Co. v. Le May, Tex.Civ.App., 28 S.W.2d 259; Sloan v. Sloan et al., Tex.Civ.App., 32 S.W.2d 513; Panhandle & S. F. Ry. Co. v. Reynolds, Tex.Civ.App., 33 S.W.2d 249; Texas & N. O. R. Co. v. West, Tex.Civ.App., 97 S.W. 2d 712; Texas Pipe Line Co. v. Sheffield, Tex.Civ.App., 99 S.W.2d 684.

The appellee contends that this evidence was admissible citing the case of Dallas Coffee & Tea Co. et al. v. Williams, Tex. Civ.App., 45 S.W.2d 724, which holds the records of a hospital organized under Chapter 5, Title 71, are admissible under article 4484 thereof because required to be kept by said chapter. There is no evidence in this record to show under what law or statute Parkland Hospital was or is organized and is now operating. There is no provision in such statute for admitting in evidence the findings had upon an autopsy. It would hardly be contended that "record of treatment" mentioned in these articles would include an autopsy performed, since after the patient is dead an autopsy operation would not constitute treatment. The Dallas Coffee & Tea Company case, supra, is in accord with our conclusion as it holds the records of a private hospital are not admissible.

■ However, had it been shown that Parkland Hospital was organized under Chapter 5, Title 71, art. 4478 et seq., in our opinion, the unsigned, unauthenticated carbon copy of the report of the autopsy would not have been admissible under the facts revealed in this record.

In Texas & P. Ry. Co. v. Graham & Price, Tex.Civ.App., 174 S.W. 297, 298, writ refused, it is said: "The third charges error in refusing to allow the defendant to introduce in evidence United States government report of tests made of the shrinkage of other cattle under similar circumstances, issued in the form of a printed bulletin. The principle, as gathered from the authorities, is that wherever documents of a public nature would themselves be evidence if produced, and which could not, without inconvenience to the public interest, be removed from their place of custody, certified copies or copies verified by some person who has seen the original are admissible, and in the absence of such proof of correct copies are not admissible. Smithers v. Lowrance, 100 Tex. 77, 93 S.W. 1064."

To the same effect is the holding in Missouri, K. & T. Ry. Co. of Texas v. Dale

Bros. Land & Cattle Co., Tex.Civ.App., 179 S.W. 935.

In Grand United Order of Odd Fellows v. Jones et al., Tex.Civ.App., 85 S.W.2d 662, it is held that it was not error to exclude the purported constitution and by-laws and the amendments thereto offered in evidence because they were not properly certified to make them admissible under the statute. Those offered were printed; the names of the officers thereto printed and the purported certificate of the State Commissioner of Insurance was not signed by him.

■ In our opinion, the court committed error in permitting the introduction of the unsigned and unauthenticated carbon copy of the autopsy report. The error in the admission of this instrument is aggravated by the fact that Drs. Ward and Shannon were permitted to use this carbon copy of said report as a basis for their opinion in which they stated that the injury received by the deceased while working at the ice plant could have been caused by the strain or over-exertion to which he was subjected.

■ The appellee asserts that if the admission of any of the purported records, including the autopsy report, was error, the objections urged thereto were waived since appellant by cross-examination had the witness, Miss Smith, repeat the testimony that she gave on direct examination and much of the matter contained in such records and interrogated her in detail relative to the purported facts contained therein.

Appellee cites some authorities which apparently sustain this position, but, without undertaking to distinguish between such authorities and those which we conceive to announce the law, we are content to follow the Supreme Court, speaking through Judge Ramsey, in Cathey v. Missouri, K. & T. Ry. Co. of Texas, 104 Tex. 39, 133 S.W. 417, 419, 33 L.R.A.,N.S., 103, in which he holds that a litigant does not waive a valid objection to testimony by cross-examination of the witness, in the following language: "It would indeed be a strange doctrine, and a rule utterly destructive of the right, and all the benefits of cross-examination, to hold a litigant to have waived his objection to improper testimony because by further inquiry he sought on cross-examination to break the force or demonstrate the untruthfulness of the evidence given in chief, in the

event, as would most usually occur that the witness should on cross-examination repeat or restate some or all of his evidence given on his direct examination. In this case it was a matter of prime importance to the plaintiff in error to test the accuracy of Tateman's evidence, to show the inaccuracy of his means of information, and if it could be done to place before the jury the fact or any evidences of his unworthiness." This doctrine is re-affirmed by Judge Sharp in Stinnett et al. v. Paramount-Famous Lasky Corporation of New York et al., Tex.Com.App., 37 S.W.2d 145; also in Hidalgo County Water Control & Improvement Dist. No. 1 v. Goodwin et al., Tex.Com.App., 25 S.W. 2d 813.

See also Traders' & General Ins. Co. v. Nunley, Tex.Civ.App., 80 S.W.2d 383.

The appellant contends under proper assignments that the court committed error in refusing to direct a verdict in its behalf because appellee failed to file her claim with the Industrial Accident Board in the time required by law and the evidence fails, it claims, to show that a "good cause" existed for such failure from the time of the death of her husband until her claim was actually filed.

It is conceded that Richard Dabney died on September 8, 1933; that the original claim for compensation was not filed with the Industrial Accident Board until February 8, 1936. The employer was and had been for many months prior to the death of the deceased a subscriber, but appellee delayed two years, five months and ten days after the death of her husband before her claim was filed. She alleged that within a week after her husband's death she was advised by an agent of the ice company that it did not carry insurance upon which she could recover; that she relied thereon and did not discover that the company carried compensation insurance until January 13, 1936; that this constituted good cause for not filing her claim and the answers of the jury in substance sustained this contention, however, these findings are not warranted by the testimony. She herself testified that she consulted the white people with whom she was living. They suggested the improbability of the truth of the agent's statement, advised her to consult a lawyer; that within two weeks she consulted and employed Mr. Frank C. O'Brien, an attorney of Dallas, to represent her in the collection of com-

:pensation insurance and shortly thereafter was advised by him that the ice company did carry compensation insurance on which she was entitled to recover; that he agreed to file her claim and that she relied on him to faithfully represent her and this was good cause for not filing the claim. She alleges that in June 1935 he informed her she could not recover and charges him with misrepresentation and fraud. The jury found that Mr. O'Brien did advise appellee in substance that she could recover and that her claim had been filed and subsequently informed her she could not recover, and that she acted as an ordinarily prudent person would in relying on his statements. Since it is admitted that appellee employed Mr. O'Brien as her attorney upon whom she says she relied until January 1936, Mr. O'Brien was her agent and the general rules of law which apply to an agency are applicable to her as principal and to him as agent. 7 C.J.S. Attorney and Client, p. 850, § 67. In the same volume, page 853, § 69, it is said: "In view of the rule that an attorney is an agent of his client and that general rules as to agencies apply to the relation of attorney and client * * * subject to qualifications and limitations stated below, notice to an attorney is notice to the client who employs him, and knowledge of an attorney is knowledge of, or is imputed to, his client. This is true whether the notice of the attorney is actual or constructive."

In Dixon et al. v. United States Fidelity & Guaranty Co., Tex.Civ.App., 293 S.W. 291, 294, the court says: "The principal, according to a settled rule of law, is bound by the knowledge of the agent. Corporations, as well as natural persons, are held responsible for the knowledge which is possessed by those whom they appoint as their representatives. Notice to an attorney is notice to the client employing him."

In Bradford v. Malone, 49 Tex.Civ.App., 440, 130 S.W. 1013, it is held that notice to the attorney is imputed to the client.

In Hexter et al. v. Pratt et al., Tex. Com.App., 10 S.W.2d 692, the Commission of Appeals holds that it is well established that notice to an attorney is notice to the client, citing numerous authorities.

The neglect of Mr. O'Brien and the information he had or should have obtained by reasonable diligence was imputable to the appellee and would not constitute "good cause" for not filing her claim. She would have redress against the attorney provided he had failed to act with the proper attention, reasonable care, and to the best of his skill and ability. 7 C.J.S., Attorney and Client, p. 977, § 140. In order to avoid the effect of their relation as principal and agent, she relied on the alleged fraud of Mr. O'Brien and if the fraudulent acts perpetrated on her by him in which the appellant did not participate constituted good cause, in order to avail herself thereof she would be required to secure a finding of the jury that such fraud had been perpetrated upon her or a finding of facts that would in law constitute fraud. Mr. O'Brien, in a letter dated January 3, 1936, states that he has talked with appellee relative to the death of her husband, and had written to the Industrial Accident Board for her relative to insurance, and from his investigation he was led to believe there was no liability on the American Ice Company for the death of deceased. An attorney does not necessarily incur liability by giving a client erroneous advice provided he acts in good faith, and he is not bound to possess and exercise the highest degree of skill, nor is he an insurer of the results of his work, but is required to possess such legal knowledge and to exercise such skill and diligence as men of the legal profession commonly employ. 7 C.J.S., Attorney and Client, p. 979, § 141. The record discloses in this case that when the claim was presented to the Industrial Accident Board she was denied a recovery for the death of her husband because she failed to show that the deceased was injured in the course of his employment. This is a circumstance to indicate that her right to recover was not so certain that the acts found by the jury against him constituted fraud as a matter of law. Fraud was not directly submitted to the jury and, in our opinion, under this record the appellee did not discharge the burden of showing that she had good cause for failure to file her claim prior to the time it was presented.

The issue of good cause and liability was submitted to the jury and found in favor of appellee, and the judgment will be reversed since the general rule is a court is not authorized to render a judgment, notwithstanding the findings of the jury, unless its jurisdiction so to do is invoked by motion to render judgment non obstante veredicto, and no such motion was filed. Stallings v. Federal Under-

writers Exchange, Tex.Civ.App., 108 S.W. 2d 449.

The judgment is reversed and the cause remanded.