LOWER COLORADO RIVER AUTHORITY, et al., Appellants,

v.

TEXAS DEPARTMENT OF WATER RESOURCES, et al., Appellee.

No. 13295.

Court of Appeals of Texas, Austin.

June 30, 1982.

Rehearing Denied Sept. 1, 1982.

Roger P. Nevola, Vinson & Elkins, Fred B. Werkenthin, Small, Craig, & Werkenthin, Lawrence S. Smith, Small, Craig & Werkenthin, Austin, for appellants.

Frank R. Booth, Booth, Lloyd & Simmons, Austin, for appellees.

POWERS, Justice.

The Texas Water Commission granted the application of Colorado River Municipal Water District seeking a permit to construct a dam on the Colorado River approximately 24 miles southeast of Ballinger, Texas. The permit, embodied in the Commission's final order, licenses the district to impound 554,340 acre feet of water by means of the proposed dam and also licenses the district to use 113,000 acre feet of water per annum, as follows: 88,000 acre feet of water per annum for municipal and domestic purposes; and 25,000 acre feet of water per annum for forced evaporative cooling and power plant operation in a steam electric generating station to be constructed adjacent to the reservoir. The Commission granted the permit following lengthy hearings before it, conducted under various provisions of the Texas Water Code.[1]

---

1. We will refer to the Texas Water Code Ann. (1972 & Supp. 1982) as "the Code" and refer to various sections of the Code simply by the section numbers designated in the Code. The proceedings were conducted as a contested case under Tex.Rev.Civ.Stat.Ann. art. 6252 13a, § 13, the Texas Administrative Procedure and Texas Register Act (APTRA).

Appellants[2] appeared in the proceedings before the Commission and opposed the granting of the permit. They obtained, in a district court of Travis County, judicial review of the Commission's action in issuing the permit. The district court having affirmed the Commission's final order, appellants have appealed to this Court. We will affirm the district court's judgment.

Appellants bring numerous points of error, the majority of which depend upon the premise that the Commission's final order rests upon an erroneous definition of the term "unappropriated water," as that term is used in § 11.134(b)(2) of the Code. That section provides that the Commission may grant a permit to use State water only if "*unappropriated water* is available in the source of supply . . . ." Appellants assign to the term "unappropriated water" the following meaning: It is that quantity or volume of water found in the Colorado River in excess of the sum total of the quantities designated in all certified filings and permits applicable to the river, to the extent such filings and permits have not been cancelled in statutory proceedings brought by the Texas Department of Water Resources, as authorized in §§ 11.171–11.186 of the Code. Relying on the fact that the uncancelled permits and certified filings exhibit, in total, a quantity or volume of water in excess of the amount of water found in the river, appellants contend that there was no unappropriated water available in the source of supply and that the Commission therefore erred in issuing the permit.

Appellees reply that the correct meaning to be assigned the term "unappropriated water" is this: It is that quantity or volume of water available in the Colorado River from time to time over and above the amount necessary to meet the requirements of downstream holders of valid and subsisting water rights, within the limits of economic necessity, for the purposes authorized

in their certified filings and permits or the purposes authorized by law as part of their riparian right. We agree with appellees' meaning, which was also that applied by the Commission and the trial court.

The Commission having concluded in its order that "unappropriated water" was available in the river, we must assume that it intended the meaning given that statutory term by the Code. Before discussing that meaning, we point out that the record of agency proceedings reveals that the Commission's conclusion of law, relative to the availability of "unappropriated water," rests upon a large amount of technical and other evidence showing the historical usage of water taken from the river and the anticipated usage of such water, taking into account numerous variables. Past usage is, of course, an indication of the quantity required in economic necessity by those persons who have taken water from the river over the years under a claim of right; if large quantities have in fact not been used, though their permits entitled them perhaps to a larger quantity, and quantities of water have flowed unused into the Gulf of Mexico, that is strong evidence that its use was not economically necessary. Moreover, the quantities of water reasonably required by those users in the future, for authorized purposes, may validly be based upon estimates supported by evidence adduced in the agency proceedings; such estimates of future circumstances are often made in similar administrative agency proceedings. Based upon such evidence, tending to show past and anticipated usage of water, the Commission found sufficient unappropriated water available to allow the district's impoundment of 554,340 acre feet of water and its use of a quantity not in excess of 113,000 acre feet of water annually, for the purposes indicated above. The permit was conditioned upon releases of water, when necessary, to meet the needs of downstream

**2.** Appellants are the Lower Colorado River Authority, a conservation and reclamation district created by the legislature, 1934 Tex.Gen.Laws, 4th C.S., ch. 7, at 19; and Garwood Irrigation Company and Lakeside Irrigation Company,

corporations organized under the irrigation laws of the State of Texas.

Appellees are Colorado River Municipal Water District and the Texas Department of Water Resources.

holders of water rights superior to those of the district, as will be discussed below.[3]

The meaning appellants assign to the term "unappropriated water" is, in our view, contrary to the very nature of the appropriative right to water evidenced by the certified filings and permits advanced by them as a basis for the argument that they represent rights to a total quantity of water in excess of that found in the river. It is, in particular, contrary to the principle of "beneficial use" of water found throughout the Code, and the important limitation of economic necessity which that principle places upon the quantity of water to which one may acquire a vested appropriative right by three years actual use of State water. Appellants argue in truth for an anomaly—an appropriative right based not upon the use of water but upon its non-use. In contrast, the meaning assigned by appellees to the term "unappropriated water" comports with the statutory principle of "beneficial use" and the nature of the appropriative right to water which has always been a right created, defined and governed by statutes which presently find expression in the Code. A discussion of the Code provisions will reveal this to be the case.

Generally speaking, the ownership of most of the water in the State is claimed by the State and is not subject to private ownership. § 11.021. Historically, the legal right to use the State's water consisted in

3. From our discussion, it will be seen that the term "unappropriated water" has a meaning, with respect to water quantity, which combines fact and law. The legal meaning of the term is ascertained from a proper interpretation of the Code: In what quantity of water may one acquire under the Code a legal right to use State water? The answer provided by the Code calls forth a factual inquiry: One may acquire a legal right only in that quantity of water which he has actually used for a three-year period to meet his economic necessities, under a permit granted by the State and for a purpose specified therein.

While the legal meaning of the term "unappropriated water" may rather easily be extracted from the Code by statutory interpretation, indeed, by a plain reading, the meaning is incomplete without a factual finding based upon historical fact, not only as to appropriators but also as to riparians and the water to which their respective rights apply and the uses to which it may be put. Moreover, future circumstances become relevant as well because of the statutory provision for "preferences" and priorities.

In *Motl v. Boyd,* 116 Tex. 82, 286 S.W. 458 (1926), the Court held that riparian rights extended only to the ordinary flow and underflow of water in a particular stream. The upper limit of the ordinary flow was set at the "line of highest ordinary flow," any water in the stream above that line being regarded as "flood waters." The "line of highest ordinary flow" was defined as the line to which stream waters reach and are maintained for sufficient time to become characteristic while stream waters are in their ordinary and normal condition, uninfluenced by recent rainfall or surface run-off. In *Motl v. Boyd,* the Court stated in dictum that water above the "line of highest ordinary flow" is available to appropriators to the extent that a violation of riparian rights, amounting to an actual interference with reasonable uses of the water, does not occur.

Some practical considerations intrude into the legal division so neatly drawn in *Motl v. Boyd, supra,* between that portion of a stream's water available to riparians and that available to appropriators. It is charged that the "line of highest ordinary flow" is impossible to draw. Hildebrand, The Rights of Riparian Owners at Common Law in Texas, 6 Texas L.Rev. 19, 29 (1928). Before the enactment of present Code provisions, riparian rights were limited to water required for household and livestock needs, and an enormous dispute prevailed as to whether they included the right to water for irrigation, it being held, for example, in *Valmont Plantations v. State,* 163 Tex. 381, 355 S.W.2d 502 (1961) that Spanish and Mexican grants along the Rio Grande did not have the appurtenant right of use for irrigation purposes, absent a specific grant of that right. *See,* White & Wilson, The Flow and Underflow of *Motl v. Boyd:* The Problem, 9 Sw. L.J. 1 (1955); White & Wilson, The Flow and Underflow of *Motl v. Boyd:* The Conclusion, 9 Sw. L.J. 377 (1955). The rights of riparians, as well as appropriators, must frequently be satisfied from watercourses which may, in normal times, contain very little, if any, water. In such watercourses, practically all of the water may be available for appropriation under the division promulgated in *Motl v. Boyd, supra.* As mentioned in the text of the present opinion, the Commission's final order protects the senior claims of all holders of water rights by express provision. In the present case, the issues are basically determinable within the context of appropriative rights. *See generally,* Trelease, Coordination of Riparian and Appropriative Rights, 33 Texas L.Rev. 24, 38 (1954); Comment, Stale Claims in Texas Stream Waters, 28 Texas L.Rev. 931, 938 (1950).

two categories: (1) the right of use belonging to riparian owners, which formerly extended to reasonable quantities of water taken from the watercourse upon which their lands lay; and (2) the right of other persons, irrespective of land ownership, to acquire a right to take and use water found in a watercourse. W. Hutchins, The Texas Law of Water Rights, 101–2 (1961). The rights of riparian owners are derived from the common law and were first recognized in Texas in 1856. *Haas v. Choussard,* 17 Tex. 588 (1856). The right of other persons to take and use water, which is called an "appropriative right," has always been a creature of statute, originating in the statutes of Western states where water scarcity made the common law rule imprudent and dictated the more practical public policy decision that the available supply of water be devoted to the highest and best use for the benefit of the maximum number of persons, hence the term "beneficial use." E. Clark, Waters and Water Rights § 4.1 (1967). Texas first promulgated in 1889 the statutes embodying this doctrine. 1889 Tex.Gen.Laws, ch. 88, at 100. The common law doctrine of riparian rights was never repudiated, however, and our law currently recognizes both doctrines, though the riparian rights doctrine has been severely circumscribed by statute. *See e.g.,* §§ 11.001, 11.303–11.324; Hutchins, *supra* at 101–62. Section 11.303 of the Code now applies to riparian rights the appropriative rights principle of "beneficial use without waste."

▪ The State's ownership of State water is a public trust and the State is under a constitutional duty to conserve the water as a precious resource. Tex.Const., art. XVI, § 59(a); *Motl v. Boyd,* 116 Tex. 82, 286 S.W. 458 (1926); *Texas Water Rights Commission v. Wright,* 464 S.W.2d 642 (Tex.1971). This duty permeates and governs the State's administration of the whole fabric of rights and obligations relative to water rights and water usage in our State.

The inherent elements, aspects, or characteristics of the appropriative right to use the State's water bear most importantly upon the present case, for the term "unappropriated water" finds its correct legal meaning therein. The first characteristic of the appropriative right, whether evidenced by a certified filing or by a permit,[4] is that the holder possesses merely a usufructuary right, that is, a right to use a particular part of State water. *Texas Water Rights Commission v. Wright, supra.* The right may be granted only by the State, pursuant to statutory authorization, and the right is limited to using the water for one or more of the specific purposes authorized by statute. *See e.g.,* § 11.023. Moreover, among the authorized purposes, there is a statutory order of preference reflecting the legislature's evaluation of the relative importance of the various authorized purposes to which State water may be put. *See* § 11.024.

Unlike the *reasonable* use limitation which formerly inhered in the riparian owner's right to use water from an adjoining stream, the holder of an appropriative right is limited to the exact quantity or volume of water stated in his permit or certified filing. But the holder of an appropriative right, within this specific quantitative limit,

---

4. Under early statutory provisions providing for the acquisition of appropriative rights, the claimant was required to record his claim in the county where the diversion occurred, in addition to being required to make use of the water so diverted. 1889 Tex.Gen.Laws, ch. 88, §§ 5 8, 1895 Tex.Gen.Laws, ch. 21, §§ 6 9. Subsequently, existing claims were required to be filed with the newly-created Board of Water Engineers and provision was made for the filing of applications and the issuance of permits evidencing new appropriative rights. 1913 Tex.Gen.Laws, ch. 171, §§ 15 38.

The 1913 Act first made an *express* limitation of the appropriative right to the volume of water beneficially used, but it *also* imposed the requirement upon certified filings previously recorded. Beneficial use may be found as an implied limitation in earlier statutes. *See* §§ 1, 2, 3 and 12 of the 1889 Act and §§ 1, 3, 4, 8, and 13 of the 1895 Act. The doctrine of beneficial use may also be viewed as a quantity limitation inherent in the appropriative right system. *Texas Water Rights Commission v. Wright, supra; Ward County Improvement District No. 3 v. Ward County Irrigation District No. 1,* 117 Tex. 10, 295 S.W. 917 (1927).

is limited in another way as well, with respect to the quantity or volume of water which he may take and use. That is, the holder of the right is limited to that quantity or volume which can be "*beneficially used* for the purposes specified" in his permit. § 11.025 (emphasis added). Indeed, the principle of beneficial use prevails throughout that part of the Code which creates, limits and governs the appropriative right to use State water.

" 'Beneficial use' means use of the amount of water which is *economically necessary* for a purpose authorized by [Chapter 11 of the Code], when reasonable intelligence and reasonable diligence are used in applying the water to that purpose." § 11.002(5) (emphasis added). Hence, any quantity of water the use of which exceeds the quantity which may be beneficially used is "*considered not appropriated.*" § 11.025 (emphasis added). That is to say, the excess over and above what is economically necessary was never appropriated at all but was taken and, if not returned, used unlawfully. This interpretation is given further force by the statutory provision that one who takes water under a permit is an "appropriator" only to the extent that he may, in fact, use the water for a beneficial use, that is, the quantity dictated by economic necessity. § 11.002(7). Moreover, one taking a quantity in excess of that required in economic necessity does so in violation of a criminal provision of the Code. § 11.081. It should go without saying that one may not acquire a legal right, in violation of a criminal statute, to a greater quantity. Therefore, the holder of an appropriative right is limited not only to the exact quantity or volume stated in the certified filing or permit which evidences his right, but is also limited to the quantity or volume which is economically necessary for the purposes stated in his permit. That this latter quantity must be only an approximation does not destroy the force of the limitation; it

simply calls forth, where competing rights conflict or are affected, administrative determinations in the contested case context of APTRA.

 The right to appropriate any quantity of water is inchoate and not perfected "unless the water has been beneficially used for a purpose stated in the original declaration of intention to appropriate water or stated in a permit issued by the [Water Resources Commission] or one of its predecessors." § 11.026. However,

> When an appropriator [as defined and limited by § 11.002(7)] from a source of water supply has used water ... for a period of three years, he acquires title to his appropriation by limitation against any other claimant of water from same source of water supply and against any riparian owner on the same source of supply.

§ 11.029.

In other words, the grant of a license or permit by the [Commission] to appropriate water concludes nobody's rights, and all who think they are aggrieved by such action have 3 years within which to file suit against the permittee or person taking water thereunder.

> \* \* \* \* \* \*

> Permit is synonymous with leave or license, and means no more than that the party has the license of the state *to become an appropriator of water upon statutory conditions.*

*Motl v. Boyd, supra,* 286 S.W. at 475 (emphasis added). Thus, a permit is no more than evidence of a right to acquire another right, the right to use whatever quantity of water the holder may require for a beneficial use. *Id.* at 475. Although a matured appropriative right is a vested right, it is a right limited to beneficial and non-wasteful uses. *Texas Water Rights Commission v. Wright, supra.*[5]

---

5. The holder of a permit was said in *Motl v. Boyd, supra,* to possess a license and the pertinent statutes were said to be "mere administrative statutes, by which a license is granted or refused, and nothing adjudicated." 286 S.W. at 474–475. Assuming, as the court said, that a "(p)ermit is synonymous with leave or license, and means no more than that the party has the license of the state to *become* an appropriator of water upon statutory conditions" (emphasis

Once the right is perfected it may be lost by wilful abandonment for three successive years. § 11.030. In such cases, "the right to use the water is forfeited and the water is again subject to appropriation." *Id.* Whether perfected or not, the right may be lost by cancellation of the holder's permit, "in whole or in part for 10 years nonuse . . . ," as a result of statutory proceedings instituted by the Department of Water Resources. § 11.172. However, the Department's failure to institute such proceedings, aimed at cancellation of a permit, and the right which it allows to make use of State water, "does not validate or improve the status of any permit, certified filing or certificate of adjudication, in whole or in part." § 11.185. Hence, if an appropriative right has been forfeited as a result of three years wilful abandonment, it is not preserved until such time as the De-

partment chooses, if it ever does, to initiate proceedings seeking to cancel the pertinent permit on the basis of ten years non-use. The statutory provision for forfeiture, set forth in § 11.030, originated in 1913. 1913 Tex.Gen.Laws, ch. 171, § 49, at 370. The provision for forfeiture is available to the holder of a junior appropriative right as against the holder of a senior appropriative right. *See e.g., City of Anson v. Arnett,* 250 S.W.2d 450 (Tex.Civ.App.—Eastland 1952, writ ref'd n.r.e.); *Lower Nueces River Water Supply District v. Cartwright,* 274 S.W.2d 199 (Tex.Civ.App.—San Antonio 1954, writ ref'd n.r.e.); *City of Corpus Christi v. Nueces County Water Control & Improvement District,* 540 S.W.2d 357 (Tex. Civ.App.—Corpus Christi, 1976, writ ref'd n.r.e.). The statutory proceeding to cancel a permit, in an action instituted by the

added), what is the legal consequence of a permit holder's actually using *less* than the quantity of water authorized in his permit?

It is evident that the permit holder has, in such a case, acquired no vested right in the unused difference; actual appropriation or use is required to perfect an appropriative right and all water not beneficially used for a purpose specified in the permit is considered not appropriated at all. §§ 11.025, 11.026, 11.029. For example, in *Clark v. Briscoe Irrigation Co.,* 200 S.W.2d 674 (Tex.Civ.App.—Austin 1947, no writ), the opinion points out that a permit holder who was authorized to take 75,000 acre-feet of water per annum acquired no vested right in the 25,000 acre feet which the permit allowed but which he did not in fact take and use for the purpose specified in his permit.

Nevertheless, until a permit is cancelled, it remains a license evidencing the holder's right to divert and use State water. The holder is presumably free at any time to increase the quantity of water which he diverts and uses beneficially, up to the maximum quantity allowed by his permit, and the increased quantity becomes the measure of his right, good as against the State under § 11.026 and good as against competing claimants under § 11.029 after three years of use. Therefore, the issue reduces to whether the permit holder may insist that the Commission, by denying new permits, keep open and free from hindrance his opportunity to increase his beneficial water usage up to the maximum allowed by his permit, at least until such time as the Department initiates formal cancellation proceedings, if it ever does, based upon ten years nonuse. We find nothing in the statutes which purports so to protect the holder of a permit.

Such a theory is contrary to the constitutional and statutory duty of the Commission to prevent waste, to the extent water is available in a source of supply to meet the unused difference but is allowed to flow unused to the Gulf of Mexico. Moreover, the decision in *Texas Water Rights Commission v. Wright, supra,* impliedly rejects the theory, for the court said that it is only when water is actually appropriated that its availability is reduced or defeated and permit holders are never vested with the right of non-use of water for an indefinite period of time. 464 S.W.2d at 647–648. Since water not actually used is not appropriated at all, as discussed at length in the text of this opinion, the Commission properly included the unused difference in the category of "unappropriated water" in its consideration of the district's application.

As pointed out in *Motl v. Boyd, supra,* the term "unappropriated water," is not defined in the relevant statutes. The court dealt in that case with the term "unappropriated water" as it was used to qualify the statutory definition of State water. The court concluded that the term "unappropriated water" included so much of the waters "as are not necessary for riparian uses," clearly tying the definition of "unappropriated water" to the excess water not required to serve what was then viewed as vested water rights. We have done the same by analogy, treating the term "unappropriated water" as meaning that quantity of water in a source of supply which is not necessary to serve the downstream holders of *vested* water rights, whether riparian or appropriative in origin.

State, was first authorized in 1953. 1953 Tex.Gen.Laws, ch. 352, at 867. The constitutionality of the cancellation provision was affirmed in *Texas Water Rights Commission v. Wright, supra.* In that decision, the court described the appropriative right as a usufructuary right held on a condition subsequent—that the water would be beneficially used. The cancellation proceeding founded upon 10 years' non-use is, presumably, analogous to an act of re-entry by the State, the owner of the paramount title, based upon a breaking of the condition subsequent.[6] There is another kind of cancellation proceeding, originating in 1913 and now set forth in § 11.146(e). The original version of that statute and its revisions by subsequent Legislatures make it abundantly clear that this cancellation provision applies *only* when cancellation is sought on the *narrow ground that a permit holder has*

failed timely to commence and pursue construction of specified works necessary to divert the water. 1913 Tex.Gen.Laws, ch. 171, § 38, at 367; 1917 Tex.Gen.Laws, ch. 88, § 7, at 212–3.

█ In addition to being limited to the quantity of water to which an appropriative right may be perfected by beneficial and actual use, the nature of the appropriative right has another important characteristic which finds expression in the Commission's findings of fact and conclusions of law in the present case. All the relevant statutes since 1889 have declared the principle that, as between appropriators, the first in time is first in right, now subject to certain statutory exceptions and judicial interpretations. The priority of an appropriator's right is determined presently by the date he

6. The statutory proceedings for cancellation are formal, as set out in §§ 11.171–11.186. They are aimed at a total or partial revocation of the document which evidences the holder's right to use State water, that his, his permit or certified filing. § 11.172. If the holder has failed to put any part of the water to a beneficial use during the ten years preceding, the document may be cancelled altogether on the basis of a conclusive presumption of wilful abandonment. § 11.173; *Texas Water Rights Commission v. Wright, supra.* If, however, he has put some part of the water to a beneficial use during the ten year period, the document is subject to cancellation to the extent of his non-use. § 11.178. An exception exists in favor of certified filings held by a municipality or a municipal water district—any beneficial use during the ten year period prevents cancellation of any part of the document. § 11.184. The importance of the department's water-usage records is illustrated by the statutory provision that cancellation proceedings are authorized when "the department finds that its records do not show proof that some portion of the water has been used during the past 10 years...." § 11.179.
In contrast to the formal cancellation proceedings described above, the statutory provision for forfeiture calls for no proceedings at all and simply declares the legal result which follows from the establishment of certain facts. The forfeiture provision works against the appropriative right directly but does not directly involve the document which evidences that right. It becomes operable only after the user of State water has perfected, or commenced to perfect, an appropriative right. Section 11.030 provides:

If any lawful appropriation or use of State water is wilfully abandoned during any three successive years, the right to use the water is forfeited and the water is again subject to appropriation.
On its face, the statute presumes a previous "lawful appropriation or use of State water," and the resulting forfeiture is predicated upon a finding of wilful abandonment for three successive years. While intent is immaterial in cancellation proceedings, it is essential to the forfeiture declared by § 11.030. *City of Corpus Christi v. Nueces County Water Control & Improvement District No. 3,* 540 S.W.2d 357 (Tex. Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.). Section 11.030 appears to be a statutory promulgation of the common law doctrine of abandonment, coupled with a three-year qualification of that doctrine, as indicated by the reasoning and citations in *City of Anson v. Arnett, supra,* followed in the other cases mentioned in the opinion.
It has been implied that cancellation of a holder's permit is necessary to effectuate a forfeiture of his appropriative right. *Hidalgo County Water Control and Improvement District No. 1 v. Goodwin,* 25 S.W.2d 813 (Tex.Comm.App. 1930, judgment approved). While that decision is rather clearly directed at another cancellation statute, based upon a failure diligently and timely to construct irrigation works, the present statutory scheme would not require cancellation with respect to forfeitures under § 11.030, for § 11.186 provides that the failure of the department to initiate cancellation proceedings does not validate or improve the status of any permit or certified filing. This provision was added to the water statutes in 1953.

files his application for a permit. § 11.141. Section 11.027 provides rather simply: "As between *appropriators,* the first in time is the first in right." (emphasis added). A user of water under a permit is, of course, an "appropriator" by statutory definition only to the extent he has actually made "beneficial use" of the water taken under his permit, that is, the quantity or volume of water which was economically necessary for an authorized purpose specified in his permit, irrespective of the quantity or volume set forth in the permit and irrespective of any excess he may have taken. § 11.002(3), (5). His right has been perfected only to that quantity or volume used by him for a three-year period under economic necessity and for the authorized purpose stated in his permit. § 11.026. Any difference between the quantity specified in the permit and the quantity so perfected by actual use is not a part of the appropriative right evidenced by the permit. The holder of the permit has no legal right to its use and was obligated by statute to return it to the source of supply for appropriation by others. § 11.046. The difference "is considered not appropriated" at all. § 11.025.

Assuming two or more competing "appropriators" require a determinable quantity of water, within the bounds of economic necessity, the senior appropriator's right was formerly exclusive as against all junior appropriators, save for certain exceptions not presently requiring discussion. Nevertheless, in applying such priority the inherent nature of the appropriative rights doctrine has long required an orchestration of the competing rights to avoid waste and to insure the beneficial use of available water. That this orchestration results from the inherent nature of the appropriative right is indicated in the opinion of the Supreme Court of Texas in *Ward County Improvement District No. 3 v. Ward County Irrigation District No. 1,* 117 Tex. 10, 295 S.W. 917, 918 (1927), where the court quoted favorably from *McCoy v. Huntley,* 60 Or. 372, 119 P. 481 (1914):

> We see no reason why, even in cases involving prior and subsequent appropriations of water, the courts cannot require

the appropriators to alternate in the use of the water. The time when water may be used recklessly or carelessly has passed in this state. With increasing settlement water has become too scarce and too precious to justify any but an economical use of it. An appropriator has only the right to use so much as his needs require, and at the time his needs require. And if these are satisfied by a use of the whole flow every other day, or every alternate week, he ought not to be heard to complain. * * * It must be conceded that there is a paucity of authority on the subject of requiring rotation in the use of water between appropriators. The remedy has frequently been applied in cases of dispute between riparian proprietors, and it is difficult to discern any difference in principle between the right of a riparian proprietor and those of an appropriator in the beneficial use of water. The trend of the later decisions is to apply this method where practicable.

The court, in its holding, validated the trial court's application of the rule to appropriators in Texas, saying the law sanctioned this orchestration of appropriative rights, based in that case upon the jury's finding that the rotation was the more practical and economical method of distributing the available water in order to meet the requirement of "beneficial use," irrigation in that case. The Commission has done nothing more than apply the same principle in the present case in an attempt to practically and economically distribute water available in the source of supply and, by orchestration of all water rights, to avoid waste and to assure the maximum conservation of water, as it is charged to do by statutory and constitutional provisions.

The statutory permit procedure is, of course, another important aspect of the appropriative right, for the right is dependent upon the permit and it sets the maximum limit of water quantity in which a right may be perfected. § 11.121. A permit may be granted in whole or in part, if the application conforms to statutory requirements, if it is accompanied by the pre-

scribed fee, if unappropriated water is available in the source of supply, and if the proposed appropriation:

(A) contemplates the application of water to any beneficial use;

(B) does not impair existing water rights or vested riparian rights; and

(C) is not detrimental to the public welfare.

§ 11.134(b)(3). We are presently concerned, among other issues, with whether substantial evidence supports the Commission's finding that "unappropriated water" is available in the source of supply. It is readily apparent that no existing water right may be impaired by the Commission's grant of the permit to the district. The district must take its place in line subject to the rights given by law to the holders of senior water rights and subject to statutory preferences among water uses. Moreover, the final order of the Commission directs in some detail how such senior rights shall be preserved from impairment, in particulars not necessary here to discuss. It is obvious that the public welfare lies in preventing waste.

In view of the preceding discussion, the term "unappropriated water" must be construed as meaning that quantity of water not required for an authorized purpose by the economic necessity of all downstream holders of vested appropriative rights. Past usage is, of course, an indication of the quantity required in economic necessity by those users; if large quantities have not been used, that is strong evidence that such use was not economically necessary and no one acquires a right to non-use for an indefinite period of time. *Texas Water Rights Commission v. Wright, supra.* Section 11.-141 gives the holders of existing water rights the legal assurance that their rights will not be impaired by other diversions, but only to the extent of their "beneficial use" of the water, that is, the amount they require in economic necessity, whatever the flow may be in the Colorado River from time to time, and to the extent the law permits an orchestration of all rights to avoid waste. There is more water in the river, from time to time, than all such holders may possibly use in fact—the river does, on occasion, flood. None should be heard to complain if the surplus is stored by erection of a new dam and reservoir, and a portion of it is appropriated to a beneficial use under a new claim, so long as their economic necessities are met, which the present order assures by specific provision and which the law would require in any event. § 11.027; *Ward County Improvement District No. 3 v. Ward County Irrigation District No. 1, supra.*

The Commission's conclusion of law, it should be observed, is in the statutory language of § 11.121, from which one must presume that the Commission's use of the term "unappropriated water" intends the Code's general concept of appropriative rights to water. So much is implied in the language of the finding. Therefore, instead of the term being vague and indecisive as charged by appellants and the dissent, we take it to have the precise legal meaning assigned to it by the statutes which the Commission is charged to administer "so as to promote the judicious use and maximum conservation ... of water." § 5.268. These statutes expressly and carefully include throughout the Code the principle of beneficial use, or the quantity of water required to meet economic necessities, and the corollary principle that the beneficial use of water lies in its conservation, while the non-use of it is waste, a result abhorred by the doctrine of appropriative rights and a result which the doctrine was specifically designed to prevent. *See Texas Water Rights Commission v. Wright, supra; Hutchins, supra* at 101–2. The statutes dealing with appropriative rights must therefore be implemented to prevent the waste of water and the principle of beneficial use, or economic necessity, inheres in the very doctrine of appropriative rights. There is no such doctrine without that principle and in promulgating the doctrine in 1889, the Legislature necessarily included that principle. *Texas Water Rights Commission v. Wright, supra.*

*Motl v. Boyd, supra,* has been misunderstood by appellants in their contention that the quantities of water specified in all the

permits and certified filings when totaled, determine within themselves the limit of unappropriated water available in a given source of supply. As said in *Motl v. Boyd, supra,* 286 S.W. at 475,

> The facts as to that question can be determined by [the Board of Water Engineers] by the mere matter of adding up the amount of water previously appropriated [as defined even then in terms of beneficial use] and *shown on their records,* and subtracting it from the amount of state water which they had *previously determined the stream furnished.*

(emphasis added). The quoted sentence refers to the power of the Board of Water Engineers to make an *ex parte* examination, on the filing of an application for a permit, to determine whether unappropriated water was available in the source of supply. § 11.131, formerly Tex.Rev.Civ. Stat. art. 7503 (repealed). The "records," of which the opinion speaks, are *not* merely the certified filings and permits which evidence appropriative rights, as appellants contend, but other kinds of records as well, compiled and maintained under administrative procedures which were somewhat different in theory and mechanics from those of the present day. While the permit procedure and other aspects of agency administration are distinctly different now, the principle of "beneficial use," in terms of "economic necessity," remains the same. Several statutes in effect at the time of the decision in *Motl v. Boyd, supra,* will help to ascertain the precise meaning of the case.[7]

Then, as now, the scope of all appropriative rights could not legally exceed the quantity of water which could be applied to

---

7. Art. 7473. Appropriators defined.—For the purpose of this chapter, an appropriator is any person, association of persons, corporation or irrigation district, who has heretofore made *beneficial use* of any water, in a lawful manner, ... or who has heretofore or may hereafter make *beneficial use* of any water within the limitations of a permit lawfully issued by the Board of Water Engineers, and *no appropriation of any water shall be considered as having been perfected, unless such water has been beneficially used* for one or more of the purposes named in this chapter, and for the purpose or purposes stated in the original declaration of intention to appropriate such water, or stated in the permit issued by the Board of Water Engineers.

Art. 7476. Beneficial use defined.—For the purpose of this chapter, beneficial use shall be held to mean the use of such a quantity of water, when reasonable intelligence and reasonable diligence are exercised in its application for a lawful purpose, as is *economically necessary* for the purpose.

Art. 7503. May reject application.—Upon the filing of such application, accompanied by the data and fees hereinbefore provided, it shall be the duty of the Board to make a preliminary examination thereof and, if it appears that there is no unappropriated water in the source of supply, or that, for other reasons, the proposed appropriation shall not be allowed, the Board may thereupon reject such application; in which case, if the application shall elect not to proceed further, the Board may return to such applicant any part of the fees accompanying such application.

Art. 7506. Board to reject applications.—It shall be the duty of the Board to reject all applications and refuse to issue the permit asked for if there is no unappropriated water in the source of supply; or if the proposed use conflicts with existing water rights, or is detrimental to the public welfare.

Art. 7507. Board to approve applications.—It shall be the duty of the Board to approve all applications and issue the permit asked for if such application is made in proper form in compliance with the provisions of this chapter and the regulations of said Board; and is accompanied by the fees required in this chapter; and if the proposed appropriation contemplates the application of water to any of the uses and purposes provided for in this chapter, and does not impair existing water rights, or vested riparian rights and is not detrimental to the public welfare.

Art. 7524. Measurements and calculations.—It shall be the duty of the Board to make or cause to be made measurements and calculations of the flow of streams from which water may be appropriated, as provided in this chapter, commencing such work in those streams most used for irrigation or other beneficial uses; to collect data and make surveys; to determine the most suitable location for constructing works to utilize the waters of the State; to ascertain the location and area of the lands best suited for irrigation; to examine and survey reservoir sites; and wherever practicable, to make estimates of the cost of proposed irrigation works, and the improvements of reservoir sites.

Art. 7525. Board conversant.—It shall be the duty of the Board to make itself conversant with the water courses of the State and of the needs of the State concerning irrigation matters, and the storage and conservation of the waters of the State for other purposes.

Art. 7527. Proper records.—The board shall keep in its office *full and proper records of its*

a beneficial use. Any excess over the quantity "not so applied shall not be considered [by the Board] as appropriated." Tex.Rev. Civ.Stat. art. 7543 (repealed). And because the Board was directed to determine the quantities "required for irrigation and other lawful uses . . ., in order to secure the highest beneficial use of such water," and to keep "full and proper records of its work, observations and calculations," we must

> *work, observations and calculations,* all of which shall be the property of the State.
> Art. 7528. Quantity of water. It shall be the duty of the Board to ascertain the quantity of water, and to *determine the proper quantities required for irrigation and other lawful uses* in the several sections of the State, *in order to secure the highest beneficial use of such water,* such work to be first conducted in those sections where, in the judgment of the Board, *the greatest necessity exists.*
> Art. 7542. Water right defined.—A water right is the right to use the water of the State *when such use has been acquired by the application* for water under the statutes of this State and for the purposes stated in this chapter. *Such use shall be the basis, the measure and the limit to the right to use water of the State at all times not exceeding in any case the limit of volume to which the user is entitled and the volume which is necessarily required and can be beneficially used for irrigation or other authorized uses.*
> Art. 7543. Use of water limited.—Rights to the use of water acquired under the provisions of this chapter shall be *limited and restricted to so much thereof as may be necessarily required when beneficially used for the purposes stated in this chapter,* irrespective of the capacity of the ditch or other works, *and all the water not so applied shall not be considered as appropriated.*
> Tex.Rev.Civ.Stat. (1925) (emphasis added).

**8.** Commencing with the creation of the appropriative right, the user was required to file with the county clerk a sworn statement showing the particulars of any works constructed for the purpose of taking water from a stream. 1889 Tex.Gen.Laws, ch. 88, § 5. A somewhat more elaborate provision was made in the 1895 Act. 1895 Tex.Gen.Laws, ch. 21, § 6, 8. The documents filed with the county clerk for recordation showed capacity for use but not actual use.

In 1913, the Board of Water Engineers was created and the permit system instituted. 1913 Tex.Gen.Laws, ch. 171, §§ 7, 15. Sections 12 and 13 preserved the requirement that the works be described in a sworn statement filed with the county clerk, who was directed to

presume it performed its official duty in all such respects. Therefore, the "records" of the Board included both the quantities specified in the permits and certified filings *and* the quantities which the Board determined were properly required for lawful use of State water, that is, the quantities which were susceptible of being applied to a beneficial use, measured against the quantities of water *actually* used.[8]

record it. Section 14 directed that a certified copy of such statement be filed with the Board of Water Engineers; and, in addition, this section required that the certified copy be accompanied by another, independent sworn statement showing, among other things, the following:

> [W]hat amount or volume of water is being actually taken, diverted or used and for what purpose; and the amount or volume of water, as near as may be, that has been *diverted, taken or used, and for what purpose, in each and every year since such original filing was made;* . . .

(emphasis added). With respect to such filings with the Board, Section 14 provided as follows:

> Every person . . . who has, prior to the first day of January, 1913, actually taken or diverted any water and applied same to any of the uses and purposes named in this Act, and is at the date of the filing of the statement herein provided to be filed, continuing to use and apply such water, who shall, within one year after this Act shall go into effect, file with the board the sworn statement last described in this Section, shall, as against the State, have the right to take and divert such water *to the amount or volume thus being actually used and applied;* provided, that nothing herein shall be construed to affect or relate to any priority or right as between any claimants, appropriators, or users from any source of water supply.

(emphasis added). The 1913 Act was amended in 1917. 1917 Tex.Gen.Laws, ch. 88, at 211. Section 83 of the 1917 amendment preserved the rights of water users under permits issued by the Board and under certified filings, provided those claiming under certified filings had filed a certified record of quantities used, as required by the 1913 Act, and provided they continued to use water for three years after the 1917 Act took effect, thereby acquiring title by limitation to a right to use the water, as against other claimants from the same stream.

The 1917 Act also required in § 100 that all users of State water keep and, before March 1 each year, file with the Board "such detailed record of daily operations as may be necessary

It is important to note that the gist of *Motl v. Boyd, supra,* with respect to the point under discussion, is that the pertinent statutes did not afford a right of appeal from the Board's determination as to whether unappropriated water was available, except under the proposition that the Board's duty was ministerial.[9] If the Board's records showed that the source of supply contained unappropriated water, the Board was duty-bound to issue the permit; if the records did not so show, the Board was duty-bound to reject the application. Are we to assume that the Board, for an extended number of years, regularly violated its ministerial duty and issued permits authorizing the use of additional quantities of water, notwithstanding that its own records reflected rights in a total quantity of water which exceeded the quantity available in the Colorado River? Are we to assume that the Legislature knew of this violation of duty by the Board and did nothing? Are we to assume that the Legislature intended an appropriative rights system unlike any other in the United States which, contrary to the doctrine's reason for being, allowed the holders of paper rights to legally compel that water flow unused to the Gulf of Mexico on the chance that they might someday decide to use a quantity of water approaching the quantities specified in their permits and certified filings? Are we to assume that the Legislature intended a useless act in requiring that users of State water report the quantities of water they *actually used every year,* and for what purpose? Did the Legislature intend to create by its statutes pertaining to such certified filings and permits a class of property wherein a few might obtain a valuable right from the State at a nominal fee, not for their necessities but to enable them to speculate therein for future profit? Are we to assume that the statutory provision requiring actual use for three years, in order that an appropriative right might be perfected in the quantity so used, meant nothing? Are we to assume, conversely, the physical impossibility that all holders of certified filings and permits perfected the full extent of their claim, as measured only by their certified filings and permits, so that more water was actually used than the river contained? These assumptions are required by appellants' fundamental position; to state them illustrates how impermissible they are. The important point is, however, that the Board's determination as to the

to determine the quantity of water taken or diverted each calendar year." At the time of the decision in *Motl v. Boyd,* §§ 83 and 100 of the 1917 Act had been codified as articles 7592, 7611, and 7612. Tex.Rev.Civ.Stat. (1925).

Thus, in addition to the records which the Board itself complied, it had, in 1927, the year of the decision in *Motl v. Boyd,* a record of actual quantities of water used, assuming that each person who was required to file a sworn statement with the county clerk did so under the 1913 Act, and assuming as well that he made the other filings and reports required by that Act and by the 1917 amendment. Therefore, when the Court in *Motl v. Boyd* stated that the availability of unappropriated water "can be determined by the board by the mere matter of adding up the amount of water previously appropriated and shown on their records, and subtracting it from the amount of state water which they had previously determined the stream furnished," it referred to records *showing the water available for appropriation,* resulting from the Board's own "measurements and calculations of the flow of streams from which water may be appropriated"—Tex.Rev. Civ.Stat. art. 7524 (repealed)—; and, it referred to the Board's records showing actual water

usage back to original certified filings, being information furnished under oath by the users of such water. Reports are presently required of users under § 11.031 of the Code and § 11.032 requires that they keep a detailed record from which annual use can be determined. *See Bartley v. Stone,* 527 S.W.2d 754 (Tex.Civ. App.—San Antonio 1974, writ ref'd n. r. e.). It is readily apparent that the pertinent statement *did not refer to the amounts set forth in* permits issued by the Board, for these would not show water appropriated by a user and would not, in any event, show rights to appropriate water which vested before the permit procedure was first instituted in 1913. Appellants' heavy reliance upon *Motl v. Boyd* thus has a faulty foundation—the case does not state what appellants attribute to it.

9. Under the present statutory scheme, the Commission is, of course, empowered to act with a broad discretion within certain statutory limits. *City of San Antonio v. Texas Water Commission,* 407 S.W.2d 752, 764 (Tex.1966). *See generally,* Current Problems-Administrative Government in Texas, 47 Texas L.Rev. 805, 869–872 (1969).

existence of unappropriated water was based not upon the amounts of water designated in certified filings or previously-issued permits, but upon records showing the quantities of water the Board had determined from its water-usage reports and its own observations, measurements, and calculations to be the "proper quantities required for irrigation and other lawful uses . . . in order to secure the highest beneficial use of such water," art. 7528 (repealed); "beneficial use" being defined then, as now, in terms of economic necessity and actual use for a three-year period. Arts. 7473, 7475 (repealed).

In summary, the fact that all the certified filings and permits may specify a quantity of water which, when totaled, exceeds the quantity of water in the Colorado River is of no legal consequence in this case, for the only relevant inquiry under the appropriative rights doctrine and the statutes pertaining to it is the total quantity of water to which appropriative rights have been perfected by three years' beneficial use, that is, use of the water for a purpose specified in the permits and certified filings in a quantity dictated by economic necessity. This has always been the case since inception of the rights now in dispute. There was no requested finding, indeed, there is no contention, that each and every permit and certified filing pertaining to the Colorado River has been perfected to the full extent of the quantity of water specified therein. Such would be necessary, of course, to support appellants' contention that these filings and permits set within themselves the total quantity of "appropriated water," allowing the easy mathematical computation of "unappropriated water," a negative quantity in this instance under appellants' theory. *See* § 11.029.

 We hold that the Commission proceeded correctly in the present case to determine the availability of "unappropriated water" on the basis of prospective requirements and historic usage of water along the Colorado River above and below the site of the proposed dam, utilizing, together with other evidence, the opinion testimony of expert witnesses. This manner of proceeding was within the power of the Commission and reflects a correct interpretation by the Commission of the relevant statutes. §§ 5.268, 11.134; APTRA § 13.

It is idle to refer appellees to the Legislature for an amendment of the statutes pertaining either to appropriative rights or to the waste of water occasioned by non-use, as the dissent would do. In the Legislature's promulgation of the statutory doctrine of appropriative rights, that body did all that was necessary to prevent such waste and allow the procedure followed by the Commission in this instance, for the doctrine is founded upon the principles of avoiding waste and assuring beneficial use, as illustrated by the pervasive and express enunciation of these principles throughout the Code, and as confirmed by the Supreme Court of Texas in *Texas Water Rights Commission v. Wright, supra,* and *Ward County Improvement District No. 3 v. Ward County Irrigation District No. 1, supra.*

Other points of error raised by appellants do not depend upon the meaning of the statutory phrase "unappropriated water," and to these we now turn.

 Appellants contend the Commission erred in holding applicable to the proceedings before it the provisions of section 2(p) of the Lower Colorado River Authority Act. That section provides that irrespective of any rights held or acquired by the Authority, for the generation of hydroelectric power, its right to impound "flood waters" of the river and to use them for the generation of hydroelectric power "shall be subject to the rights of any other person, municipal corporation or body politic" which had previously acquired, or may subsequently acquire, the right to impound such waters and put them to beneficial use under a permit issued by State authority. Appellants' contention that the statute gives priority in such "flood waters" only to holders of permits which were subsisting at the time of the statute's enactment is patently wrong, for the statute expressly makes the Authority's rights subordinate as well to rights acquired under permits issued

"thereafter." Appellants also contend, however, that the statute is expressly limited to declaring superiority with respect to rights in "flood water" and, for that reason, they suggest that we "should strike from the findings of fact and conclusions of law and from the permit itself all references to the Lower Colorado River Authority Act, Section 2(u)." They do not suggest that the error by the Commission, if error there is, prejudices any substantial right they possess. APTRA § 19(e).

We do not see that our striking the relevant findings of fact and conclusions of law, based upon an allegedly erroneous interpretation given the statute by the Commission, will cure any prejudice, even if such existed. Section 2(p) is a statute presently in force and is a restriction upon the Lower Colorado River Authority which is applicable in any event; it is not a restriction upon the Commission. Section 2(p), orchestrated with §§ 11.027 and 11.141 of the Code and other provisions thereof, will determine the relative priorities of appellants and the district in any conflict which may arise after the district perfects an appropriative right or commences to produce hydroelectric power. We need not, therefore, determine in this proceeding the meaning of the term "flood waters" and the priorities of the parties therein. There being no prejudice claimed by appellants in this respect, the point of error is overruled for this reason.

■ Appellants contend next that the Commission erred in holding applicable to the proceedings § 11.028 of the Code, which provides in part as follows:

Any appropriation made after May 17, 1931, for any purpose other than domestic or municipal use is subject to the right of any city or town to make further appropriations of the water for domestic or municipal use without paying for the water.

The Commission found as a *fact* that the foregoing section was applicable to the proceedings and recited that:

... appropriations in the Colorado River Basin made after May 17, 1931, for purposes other than domestic and municipal

uses should be further appropriated by the domestic and municipal use appropriation granted by this Order whenever priority of appropriation may be enforced.

This finding of fact is rather plainly an attempt by the Commission, albeit an awkward attempt, to state that the permit awarded the district allows the appropriation of water for domestic and municipal uses having priority over previous appropriations made after May 17, 1931; and these earlier appropriations are subject to the district's permit, by virtue of § 11.028. The awkwardness results from the term "further appropriations" used in § 11.028. The categorization as a finding of fact evidently results from the Commission's determination of the authorized uses to which the appropriated water must be put; the proposition stated in the finding is rather plainly a mixed statement of law and fact.

Appellants complain that (1) the finding is irrelevant in a proceeding aimed at determining whether to issue a permit; (2) § 11.028 applies, by its own terms, "to the rights of any *city* or *town*" and the district, being neither, can obtain no right conferred by the section; and (3) the Commission's finding does not spell out the mechanics for adjusting the priorities between the instant permit and other rights to water, including the rights of other municipal and domestic users. We overrule the point of error. The finding is relevant because it fixes the uses to which the water can legally be put under the permit, for it forms a condition of the permit as well as a finding of fact. Otherwise, it occasions no prejudice to appellants.

■ Moreover, we believe appellants err in the meaning they would assign to § 11.028. As originally enacted, § 11.028 provided as follows:

As between appropriators, the first in time is the first in right, provided, however, for all appropriations or allotments of water hereafter made for hydroelectric power, irrigation, manufacturing, mining, navigation, or any other purposes than domestic or municipal purposes, shall be granted subject to the right of any city,

town or municipality of this State to make further appropriations of said water thereafter without the necessity of condemnation or paying therefor, for domestic and municipal purposes as herein defined . . . .

1931 Tex.Gen.Laws, ch. 128, at 217. The same act insured the priority of water for domestic and municipal uses by other provisions found in section 1, declaring such use to have the first priority over any other use whatever, and in section 3, declaring the right to take water for such purposes is "primary and fundamental, and the right to recover from other uses, waters essential to such purposes shall be paramount and unquestioned. . . ." Section 3 also gave the power of eminent domain to all "political sub-divisions of the State, and Constitutional Governmental Agencies exercising delegated Legislative powers," to take water for municipal and domestic purposes.[10] Presently, § 11.024 of the Code sets out the preferences, again giving first preference to water for "domestic and municipal uses, including water for sustaining human life and the life of domestic animals"; § 11.027 declares the first in time, first in right, doctrine; § 11.028 declares an exception to that doctrine in favor of cities and towns, allowing them to make "further appropriation" for domestic or municipal uses; and

§ 11.033 gives the power of eminent domain in essentially the same terms as the original statute. It is obvious that the present statutes are in *pari materia* and in cases such as the one before us several provisions of the Code Construction Act, Tex.Rev.Civ.Stat.Ann. art. 5429b–2, apply: it is presumed that the Legislature intended to favor the public interest over any private interest, § 3.01; we may consider, in construing the relevant statutes, the object sought to be obtained, the circumstances under which the statutes were enacted, their legislative history, former statutory provisions, the consequences of a particular construction, and the administrative construction of the statutes, § 3.03; and we must construe special provisions and general provisions so as to give effect to both, if that is possible, § 3.06. (Section references in the foregoing sentence are to the Code Construction Act.) Moreover, we are bound by the fundamental rule that we must ascertain and give effect to the Legislature's intent; and, in so doing, we must consider and give effect to all laws bearing on the same subject. *Jessen Associates, Inc. v. Bullock,* 531 S.W.2d 593 (Tex.1975).

The district was created a conservation district, by special law, under Tex.Const., art. XVI, § 59, "for the purpose of provid-

---

**10.** The complexity of managing the State's water supply is difficult to over-emphasize, due in no small part to the legal status of water as an article of property. The first variable is obvious. The amount of water available varies greatly, even from day to day, with respect to that portion of the total water supply derived immediately from rainfall. Moreover, once on the earth, and assuming no natural or artificial intervention, the water is in constant motion and will be lost forever if not reduced to possession and put to use. The need for water does not always coincide with its availability; for example, the need for irrigation water may not coincide in time with an abundance of water in a stream. Conversely, when water is required for irrigation, there may be little available in the stream. Superimposed upon the circumstances is the obvious fact that some uses of water are more immediately important than others. The quantity of water required for municipal purposes is relatively steady and predictable, and overriding in importance as compared to some other uses to which water may legally be put. Water may legally be used

for industrial purposes, irrigation, mining, hydroelectric power, navigation, recreation, and other "beneficial uses." § 11.024. Capturing water in reservoirs, by means of dams, alleviates but does not remove entirely the problem of matching water availability with a need. For example, release of water to generate needed electric power may not coincide with a need for the water on the part of a downstream irrigator; or the release of water to assure sufficient reservoir capacity to prevent a downstream flood, may cause the waste of water because it is more than all downstream users can use. On some rivers, it is important to release sufficient water to create a force near the river mouth which holds back the intrusion of salt water. When these large and important interests are interlocked with the equally important interests represented by the property rights to use water, held by thousands of individuals, not to mention the difficult engineering problems involved, the enormous complexity of administering the State's water laws become apparent.

ing a source of water supply for municipal, domestic and industrial use and processing and transporting the same . . .;" it is a "governmental agency and a body politic and corporate;" and *it is empowered to acquire water appropriation permits* and to impound, by means of dams, the "unappropriated flow of the Colorado River . . . ." 1949 Tex.Gen.Laws, ch. 340, §§ 1, 7, 15, 17 at 655 *et seq.* In findings of fact not challenged by appellants, the Commission found that the district presently furnishes water directly or indirectly to eight cities and towns and, given its location and distribution facilities, is the "logical supplier of both present and future domestic and municipal water requirements" in fourteen counties named in the Commission's final order. The permit which forms part of such order authorizes the district to divert and use "88,000 acre feet of water per annum for municipal and domestic purposes." The Commission was under a statutory duty to "give preference to applications in the order declared in Section 11.024 of [the Code] and to applications which will effectuate the maximum utilization of water and are calculated to prevent the escape of water without contribution to a beneficial public service." § 11.123. The preferences listed in § 11.024 are categorized, and assigned priority, based not upon the nature or character of the holder of the water right, but based upon the use of water, domestic and municipal uses being the first preference.

■ It would exalt form over substance, and destroy the general legislative scheme based upon the priority of municipal and domestic water use, were we to hold that the district, because it is not a city or town, was not entitled to the preference listed in § 11.024. Water supply contracts are subject to public control and the suppliers of water are under a statutory duty to furnish water to adjoining landowners upon reasonable demand. §§ 11.036, 11.037, 11.038, 11.039, 11.041. Suppliers are also, of course, subject to their pertinent contract obligations, regulated by the State. In the present case, the district is a body corporate and politic coextensive with the geographi-cal areas of several cities to which it supplies water, all of which have statutory authority to acquire a water supply. Tex. Rev.Civ.Stat.Ann. arts. 1015(30), 1109. The manner in which a city exercises this power to provide a suitable water supply rests largely in the discretion of its governing body. *Kimbrough v. Walling,* 371 S.W.2d 691 (Tex.1963). The meaning for which appellants contend would deprive the governing body of a city of this discretion and require, if the city is to maintain a preferred position for domestic and municipal uses, that the city itself obtain a permit, notwithstanding that the special law which created the district empowered it to do so, for the benefit of the municipalities served by it. We do not see that the Code intended this result. That § 11.028 makes appropriations after May 17, 1931, insofar as they are not for domestic or municipal use, "subject to the right of any city or town to make further appropriations of the water for domestic or municipal use" without payment, only reiterates the preference for domestic and municipal use found elsewhere in the Code.

■ The rule of *expressio unius est exclusio alterius,* relied upon by appellants, is only a rule of construction, subject to the paramount rule that we must give effect to all related statutes. In doing so, we hold that the supervening importance given throughout the Code to beneficial water usage, particularly usage for domestic and municipal purposes, demonstrates the unmistakable legislative intent that such usage is the controlling factor and that the provision relative to cities and towns in § 11.028 was intended merely as an exception to the general rule of first in time, first in right, now found in § 11.027, the applicability of the exception being defined by §§ 11.024 and 11.028 when they are construed together.

■ We find no error in the Commission's failure to set forth the mechanics for adjusting the priorities between the district's permit and the rights of other users of water. That is a matter governed by

statute and the common law, to be considered when and if a conflict occurs.

Accordingly, we overrule appellants' point of error which challenges the Commission's finding that the 88,000 acre feet of water, authorized under the permit, are to be used annually for domestic and municipal purposes.

We have examined appellants' remaining points of error and find they are without merit. They are, accordingly, overruled. Finding no error, we affirm the judgment of the district court.

Affirmed.

SHANNON, Justice, dissenting.

I file this dissent respectfully.

The central question in this appeal concerns the meaning of the term "unappropriated water" as used in Tex.Water Code Ann. § 11.134(b)(2) (Supp.1982).

The Colorado River rises in intermittent draws in Dawson County in West Texas and flows generally southeast approximately six hundred miles to its mouth on Matagorda Bay. I Texas State Historical Association, Handbook of Texas 380 (1952).

The Colorado and its tributaries, the principal ones being the Pedernales, Llano, San Saba, and Concho Rivers, have a drainage basin of approximately 37,800 square miles. Texas State Historical Association, I Handbook of Texas 380 (1952). On occasion, the river experiences great rises when there is more water than anyone wants or needs, and flooding becomes a problem. Conversely, the regions through which the river flows often suffer withering droughts and the river then has extremely low flows. It is a fair statement that the Colorado is an inconstant stream.

The water of the Colorado and its tributaries furnishes part or all of the municipal water requirements of Midland, Odessa, Big Spring, San Angelo, and Austin, and are used throughout the basin for irrigation, manufacturing, hydroelectric generation, and other purposes.

There has been much previous development of the waters of the Colorado by construction of several dams and reservoirs. Appellee District presently owns and operates Lakes J. B. Thomas, located between Snyder and Big Spring, and E. V. Spence, near Robert Lee. San Angelo, together with the U. S. Bureau of Reclamation and the U. S. Corps of Engineers, maintains three reservoirs on the Concho and its branches, Lake Nasworthy as well as the Twin Buttes and O. C. Fisher Reservoirs. LCRA operates six lakes on the Colorado in Central Texas: Lakes Buchanan, Inks, Lyndon B. Johnson, Marble Falls, Travis, and Austin.

The site of the proposed Stacy Dam is on the river in Coleman, Concho, and Runnels Counties. The permit granted appellee District allows it to impound 554,340 acre-feet of water in the reservoir and to divert and use 88,000 acre-feet of water yearly for domestic and municipal purposes and 25,000 acre-feet of water per annum for industrial purposes.

By statute, the Commission is empowered to grant a permit to appropriate water only if it finds that unappropriated water is available in the source of supply. Tex. Water Code Ann. § 11.134(b)(2) (Supp. 1982). The Commission made that finding affirmatively in number fifteen, the only provision in the agency order addressing the adequacy of unappropriated water to support the proposed appropriation:

> After recognizing downstream existing appropriations and claims below Stacy Dam, the Commission finds that *there are unappropriated flows* in the Colorado River at the dam site *sufficient to permit the impoundment of 554,340 acre-feet of water* at elevation 1551.5 feet above mean sea level and the diversion and consumptive use of not to exceed 113,000 acre-feet of water per annum without impairing existing water rights, provided releases of water from the reservoir are made from time to time in such quantities as may be necessary to provide water to which all superior and senior water rights are entitled. (Emphasis added)

Nonetheless, the amount of unappropriated water available in the Colorado River according to the records of the Commission is only an insignificant fraction of the total acre-feet applied for by appellee District and ultimately granted appellee District by the Commission. The differences between the parties to this proceeding do not concern a determination of the amount of water physically present in the river, but instead concern divergent views as to the meaning of "unappropriated water" as used in Tex.Water Code Ann. § 11.134.

An examination of fact finding fifteen in an effort to determine the Commission's rationale supporting its determination of the existence of unappropriated water is not helpful. Rather than being "concise and explicit," as provided by Tex.Rev.Civ. Stat.Ann. art. 6252–13a § 16(b), the finding, as aptly characterized by LCRA, is instead "vague and indecisive." Finding fifteen contains simply the bare statement that the Commission, after recognizing downstream appropriations, found sufficient unappropriated flows to permit impoundment of 554,340 acre-feet of water. In dealing with this character of problem, the Supreme Court has stated: "It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong'." *Securities & Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947).

I have examined finding fifteen, and after the most careful reading, the authority, reasons, and logic employed by the Commission in its discovery of a huge quantity of unappropriated water existent in the Colorado remain shrouded in delphic mystery. On review, then, the majority and I have been relegated to an inspection of the parties' explanation of the Commission's rationale.

The Lower Colorado River Authority insists that the assessment of the extent to which the waters of a river are appropriated, for purposes of granting or denying a permit, must be based upon the quantities specified in the outstanding permits and certified filings. Therefore, if a permit has been issued for the use of water, the water specified in that permit is not subject to a new appropriation by the Commission until the permit has been cancelled in whole or in part.

Counsel for the District and Commission advance the argument that "unappropriated water" refers to water which is not currently being used by existing appropriations and which is probably not going to be beneficially used by those appropriations in the near future. Presumably, the determination of the probability of future beneficial use under this concept of unappropriated water is to be made on an *ad hoc* basis in each application proceeding by "experts" who project population growth and other factors thought to affect future water use.

Appellees' view is that existing water right holders are considered to have appropriated only so much water as may have been beneficially used by them as of the date of the hearing, in addition to those amounts as the Commission finds will be foreseeably used by them in the future. Supposedly, the Commission will make this evaluation in each hearing for a permit based upon the record in each proceeding, unfettered by prior determinations and without regard to the quantity of appropriated water stated in the outstanding permits. Under appellees' view, outstanding rights which have been perfected by use may be reduced from presently perfected use if, in the Commission's opinion, their future use will be less than present or prior use.

I do not agree with appellees' rationale in support of the Commission's finding for several reasons. One reason is that their argument is in total conflict with the expressed legislative intent that applications for appropriation of water be considered by the Commission in a consistent and uniform

manner. The system for regulating use of water by granting administrative appropriation permits was first enacted by the legislature in 1913 and later re-enacted in 1917. 1913 Tex.Gen.Laws, ch. 171, at 364; 1917 Tex.Gen.Laws, ch. 88, at 211. The statutes presently applicable to applications for permits to appropriate water (§ 11.134(b)) are substantially the same as the original Act of 1913. Frank R. Booth, Applications for Permits to Appropriate Water, Proceedings of the University of Texas Water Law Conference 96 (1959).

Section 19 of the 1913 Act reads:

It shall be the duty of the board to reject all applications and refuse to issue the permit asked for, *if there is no unappropriated water in the proposed source of supply;* or if the proposed use conflicts with existing water rights, or riparian rights, or is detrimental to the public welfare. It shall be the duty of the board to approve all applications and issue the permit asked for, if such application is made in proper form in compliance with the provisions of this Act and the regulations of said board; and is accompanied by the fees required in this Act; and if the proposed appropriation contemplates the application of water to any of the uses and purposes provided for in this Act; and does not impair existing water rights, or riparian rights, and is not detrimental to the public welfare. 1913 Tex. Gen.Laws, ch. 171, at 364. (Emphasis added).

Section 11.134(b) of the Texas Water Code reads:

(b) The commission shall grant the application only if:

(1) the application conforms to the requirements prescribed by this chapter and is accompanied by the prescribed fee;

(2) *unappropriated water is available in the source of supply;* and

(3) the proposed appropriation:

(A) contemplates the application of water to any beneficial use;

(B) does not impair existing water rights or vested riparian rights; and

(C) is not detrimental to the public welfare. (Emphasis added)

The 1913 Act supplanted a scheme of state water rights based on local filings, the primary characteristic of which seemed to be disorder. Under the local filing system, it was impossible to measure outstanding claims or the availability of unappropriated water on any particular segment of a stream. The 1913 legislature considered the then existing laws governing water rights to be in an "unsatisfactory condition," impeding economic development. 1913 Gen.Laws, ch. 171, § 102 at 379. The 1913 Act sought by the centralized permit system to bring order into the regulatory process:

The principal purpose and function of the 1913 Act was to substitute the permit system (of obtaining a statutory water right under state administration) for the ex-parte declaration of the appropriative system theretofore existing under the General Irrigation Acts of 1889 and 1895. *City of Corpus Christi v. Nueces County Water Control & Improvement District,* 540 S.W.2d 357, 372 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.).

The permit system reflected an effort to achieve control over water appropriations, and thereby obtain more certainty in an area of law where certainty is essential. The development of irrigation systems and adequate municipal water and power sources required capital, and capital was not then, and is not now, forthcoming in an atmosphere of legal uncertainty. As a result, the legislature passed the 1913 Act with the express purpose of settling uncertainties in the law so as to attract capital:

Not only are riparian and other existing water rights protected [by the Act], and established enterprises safeguarded; but a foundation is afforded to new development. Under our present statutes the appropriator who, in good faith, complies with all the requirements thereof does not know whether he has obtained anything thereby, nor can he offer any assurance of that fact to those from whom he would obtain capital to develop his enter-

prise. *Who will advance funds for costly improvements, dependent for their value solely upon a water supply that may exist today and tomorrow be numbered among the things that were?* How many individuals and communities in this State . . . have sought to interest capital and been met upon the threshold by the legitimate and unanswerable objection: "You have no adequate protection under the law to assure the water supply upon which your proposition depends?" *When the provisions of this bill are complied with and a permit obtained, a reasonable assurance of title and of legal protection of the rights involved can be shown.* Tex.H. R.J., Thirty-third Legislature 949, 954 (1913). (Emphasis added throughout unless otherwise noted.)

Moreover, the provisions of the 1913 Act, particularly the requirement that the Board of Water Engineers reject an application *if* there is no unappropriated water, were designed to insure those who obtained permits of a definite supply of water for their present and future needs. As stated by Representative Glasscock, one of the authors of the 1913 Act:

In the public hearing before our committee [the Committee on Irrigation] the most grave complaint and strongest plea for relief was presented by those who had made extensive development of irrigation and other enterprises, in some cases operated for years, only to be deprived of their water by more recent diversion of the supply at an upper point upon the stream. . . . Now, in this bill we take, as we must, all existing rights as we find them . . . and leaving these existing rights undisturbed, undertake to protect them, to remedy the grave condition mentioned that an existing enterprise may be ruined by subsequent diversion of its water supply above its point of intake, and to provide a safer rule for the future, by the application of certain important and underlying principles. . . . Tex.H. R.J., Thirty-third Legislature 949, 953 (1913).

One of the principles enumerated by Representative Glasscock to insure a "safer rule for the future" was that it would be the duty of the Board of Water Engineers "to reject all applications and refuse to issue the permit asked for, if there is no unappropriated water in the proposed source of supply." This precept can be effective only if the method of determining whether unappropriated water exists is based upon a reasonably certain determination of the amount of water previously appropriated and the amount of water available for future appropriation. On the other hand, if the measure of unappropriated water were based upon present and future *projected* use, the problems sought to be resolved by the permit system would hardly have been addressed because capital investments would not be encouraged by a system in which one's practical right to water is predicated on speculation and the inexact art of forecasting use.

The most basic doctrine of statutory construction is that courts must ascertain and give effect to legislative intent. *Jessen Associates v. Bullock,* 531 S.W.2d 593 (Tex. 1975). If, indeed, the legislature has spoken, it cannot be said that the courts should make a different choice simply because that choice seems, at the moment, to make better sense. All too often courts are required to divine the meaning of statutes in the absence, or near absence, of any objective indication of legislative intent. In this appeal, however, as previously demonstrated, the legislative purpose is made plain. The legislature intended by the 1913 Act to bring order and certainty to Texas water law so as to encourage capital investments and to protect appropriators' reliance on their permits and certified filings. These purposes were to be accomplished by having one administrative agency administer the program and then by requiring uniform and consistent procedures and standards for the application and granting of such permits. It is apparent that the legislature believed that by means of such legislation, in particular the requirements as to the contents of the applications and permits and the requirement that the Board of Water Engi-

neers "make or cause to be made measurements and calculations of the flow of streams from which water may be appropriated" 1913 Tex.Gen.Laws, ch. 171, § 42 at 368, it would be possible to measure with some certainty on any one watershed the extent of water subject to outstanding rights and the extent of unclaimed water subject to further issuance of permits.[1] Since § 19 of the 1913 Act is the basis for § 11.134 of the present Water Code, the legislative purpose in the enactment of § 19 should be controlling in construction of the term "unappropriated water" as employed in § 11.134.

Since the enactment of the original statute in 1913, the legislature has consistently reaffirmed the concept that unappropriated water is defined, in part, by giving consideration to the quantities stated in outstanding permits and certified filings. In 1953, the legislature first enacted the ten year cancellation provisions, now codified as Tex. Water Code Ann. §§ 11.171–11.186. The emergency clause of the 1953 Act, 1953 Tex.Gen.Laws, ch. 352, at 868, provided:

Sec. 5. The fact that there are many permits heretofore granted by the Board of Water Engineers and certified filings heretofore filed with said Board, under which no part of the water authorized to be diverted and appropriated has been put to beneficial use and the further fact that *there is great need for making such water available for beneficial use* creates an emergency and an imperative public necessity that the Constitutional Rule requiring that bills be read on three several days in each House be suspended, and the same is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted. (Emphasis supplied)

In 1957, the 1953 ten year limitation provisions were amended. 1957 Tex.Gen.Laws, ch. 39, at 82. In addition to making specific

provisions that the waters covered by cancelled permits would be subject to reappropriation, the legislature again stated in the emergency clause that one of the purposes of amending the cancellation provisions was to make water available for further appropriation. The emergency clause provided:

Sec. 3. The fact that the present law does not provide for total and partial cancellation of certified filings and permits even though all or a part of the water is not being appropriated and beneficially used thereunder, *the fact that a public need exists to make such water available for appropriation and beneficial use,* and the further fact that the present law needs to be clarified so as to remove inconsistencies, create an emergency and an imperative public necessity that the Constitutional Rule requiring bills to be read on three several days in each House be suspended; and said Rule is hereby suspended, and this Act shall become effective and be in force from and after its passage, and it is so enacted. (Emphasis supplied)

The Supreme Court in *Texas Water Rights Commission v. Wright*, 464 S.W.2d 642, 647 (Tex.1971), sustained the ten year cancellation provisions against a constitutional attack. The Court in *Wright* observed that one of the purposes of the cancellation statute was to make unused water covered by a permit available for reappropriation.

The permittees did not acquire the right of non-use of water. Common to the law of the western arid regions and of appropriation law generally is the idea that non-use of appropriated waters is a waste of the water. *Once water is appropriated, its availability to another user is reduced or defeated,* and if the permittee does not use a substantial portion of it the water will run unused into the sea. A workable system of appropriated

---

1. [The provisions of the 1913 Act established] a procedure by which the rights in the waters of a stream might be ascertained, thus giving a warrant of safety to capital. For the first time a *central repository for records of appropriations was provided, where the amount of water* *appropriated from a stream, and the amount available for further appropriation might be ascertained with some degree of certainty.* Cox, The Texas Board of Water Engineers, 7 Texas L.Rev. 86, 96 (1928). (emphasis added)

waters has produced the general rule that the beneficial use of waters is the conservation of the resource, whereas, the non-use of appropriated waters is equivalent to waste. (Emphasis added)

Accordingly, it may be seen that the reference in § 11.134(b)(2) is not an isolated occasion of legislative concern about which water is and is not available for appropriation. Each time the legislature has provided a mechanism by which rights under a permit or certified filing may be forfeited, it has plainly indicated that water in a permit or certified filing, until forfeited or cancelled, is "appropriated water."

There are other legislative enactments in support of the definition of unappropriated water advanced by LCRA. For example, section 49 of the 1913 Act (Section 46 of the 1917 Act, and presently § 11.030 of the Texas Water Code) provides:

Sec. 49. Right Forfeited by Abandonment.—Any appropriation or use of water heretofore made under any statute of this State or hereafter made under the provisions of this Act which shall be willfully abandoned during any three successive years, shall be forfeited *and the water formerly so used or appropriated shall be again subject to appropriation for the purposes stated in this Act.* 1913 Tex.Gen.Laws, ch. 171, at 370. (Emphasis supplied)

Texas Water Code § 11.146(e) (Supp. 1982), of course, is a further prime example:

If a permit has been issued for the use of water, *the water is not subject to a new appropriation* until the permit has been cancelled in whole or part as provided by this section. (Emphasis supplied)

Section 11.146(e) is in complete harmony with the principle that the Commission in determining unappropriated water must give consideration to the quantities stated in outstanding permits and certified filings.

Appellees persist that their definition of "unappropriated water" is the better view today in a dry and thirsty land. They urge their view would prevent "untold waste of water resources" which would otherwise flow into the sea. There may be validity to appellees' suggestions, but such policy arguments are properly addressed to the legislature to change the law rather than to courts to construe that law. However attractive appellees' policy argument may be, it must yield to the prior legislative determination of which measure is in the public interest. In considering a statute wherein it is not clear whether the legislature has considered and answered a particular question, courts may legitimately consider policy arguments. On the other hand, it is basic law that if the language of the statute or the legislative history of the statute evidences that the legislature has considered the question and provided an answer, the duty of the courts is to respect and give full recognition to the legislative answer. In such situations, as here, the legislature presumably has considered and weighed the conflicting policies and arguments, and the courts must defer to the legislative determination.

If, as appellees assert, users downstream from the proposed Stacy site are not using the water to which they are entitled by permit or certified filings, the solution mandated by the legislature is for the Commission to initiate cancellation proceedings pursuant to Tex.Water Code Ann. § 11.174 (Supp.1982).

Appellees' view of unappropriated water is faulty for the further reason that it conflicts with the view of the Supreme Court of Texas stated only a few years after enactment of the Acts of 1913 and 1917. *Motl v. Boyd,* 116 Tex. 82, 286 S.W. 458, 475 (1926). The Court in *Motl* stated:

It is the duty of the [Board of Water Engineers] to reject applications where there is no unappropriated water in the source of supply. The facts as to that question can be determined by the [Board of Water Engineers] by the mere matter of adding up the amount of water previously appropriated and shown on their records, and subtracting it from the amount of state water which they had previously determined the stream furnished."

The Commission characterizes the Supreme Court's opinion in *Motl* as "overly simplistic," while the District seeks to minimize the importance of the quoted part of the opinion by describing it as "somewhat simplistic and generally discredited dicta." The District suggests further that the "validity today [of the quoted language from *Motl v. Boyd*] is doubtful."

It is true that *Motl* has been criticized and some parts of the opinion have been overruled. *See Valmont Plantations v. State,* 163 Tex. 381, 355 S.W.2d 502 (1962). The quoted language from *Motl* is not the holding in the case, but it is an expression by the Supreme Court only a few years after the enactment of the 1913 and 1917 Acts as to its understanding of the appropriative process.

Administrative agencies are governed by statutes, as construed and applied by courts. In this proceeding it is abundantly clear that it was not the office of the Commission, the district court, or this Court to ignore the expression of the Supreme Court in *Motl v. Boyd, supra,* and embark upon a construction of their own choosing.

The Commission's definition of unappropriated water in the present controversy is a departure from the definition adhered to by its predecessors. The Commission and its predecessors determined the existence of unappropriated water by applying the *Motl v. Boyd* formula. For example, the 19th Biennial Report to the Governor (1948–1950), of the Board of Water Engineers, the Commission's predecessor, stated, at page eight:

> The procedure for obtaining a permit has been made as simple as possible, although the Board does require sufficient data to be filed to establish, when the permit is granted, that the appropriator has legal claim to a water right, and to permit the location of this right to be determined. *Such data are necessary in order that a continuous inventory of all appropriations will show the relation of total annual appropriations to the annual runoff of each stream, and thereby insure that the streams do not become over appropriated and that a prospective applicant for [a] permit can determine whether a suitable supply is available for a particular project.* (Emphasis supplied)

Likewise, A. R. Rollins, while serving as a member of the Board of Water Engineers, stated that "[t]he Board of Water Engineers, under present methods of operation, recognizes the total appropriations on a stream when it is considering a new application." Rollins, The Need for a Water Inventory in Texas, Proceedings of the University of Texas Water Law Conference 67 (1952). In another paper presented at the same conference, V. W. Bouldin, whose knowledge of water law is highly respected, stated that:

> Under the statutes as interpreted by the Attorney General, the waters covered by [outstanding] permits are not subject to re-appropriation until the permits have been cancelled. V. W. Bouldin, The Law of Surface Water Rights in Texas, Proceedings of The University of Texas Water Law Conference 97, 102 (1952).

*See also* Thompson, Public Administration of Water Resources in Texas 128 (1960).

The fact that the Commission has now decided that it possesses the power to determine "unappropriated water" based on beneficial use and has acted on that decision may not be supported by an appeal to the rule of contemporaneous construction. It would be strange indeed if an agency could by mere process of construction create for itself a power which the legislature had not given it. *Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co.,* 167 U.S. 479, 17 S.Ct. 896, 42 L.Ed. 243 (1896); *Railroad Commission v. Atchison, Topeka & Santa Fe Ry.,* 609 S.W.2d 641 (Tex.Civ.App. 1980, writ ref'd n. r. e.).

It may be that the time has come to revise the laws governing the availability of "unappropriated waters." All would agree, however, that the revision of the law is properly the function of the legislature and not that of administrative agencies or courts. "Actual or supposed deficiencies in [the laws regulating the use of a natural resource] . . . will not justify a court's ex-

cursion beyond its proper sphere in order to plug a hole or cure a supposed defect in the legislative scheme of things." *State ex rel. Edwards v. Reyna,* 160 Tex. 404, 333 S.W.2d 832, 838 (1960); *Southern Pacific Transport Co. v. Railroad Commission,* 592 S.W.2d 74 (Tex.Civ.App.1979, writ ref'd n. r. e.); *Railroad Commission v. Atchison, Topeka & Santa Fe Ry., supra.*

I would reverse the judgment and remand the cause to the district court with instructions that it order the Texas Water Commission to set aside the permit heretofore granted appellee District.